841 So.2d 431 (2003)
Ian Deco LIGHTBOURNE, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-553.
Supreme Court of Florida.
January 16, 2003.
Rehearing Denied March 21, 2003.
*433 Suzanne Myers, Assistant CCRC, Office of the Capital Collateral Regional Counsel-Southern Region, Fort Lauderdale, FL, for Appellant.
Charlie Crist, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Ian Deco Lightbourne, a prisoner under sentence of death, appeals an order of the circuit court denying a successive motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the trial court's order denying Lightbourne's motion for postconviction relief.

BACKGROUND
The procedural history of this case, including the facts of the original crime, are fully set forth in our last opinion in this case. See Lightbourne v. State, 742 So.2d 238 (Fla.1999). Lightbourne, a Bahamian immigrant who was twenty-one-years old at the time of the crime, is on death row for the 1981 murder of Nancy O'Farrell, the daughter of an Ocala thoroughbred horse breeder. See id. at 240. Lightbourne was found guilty of first-degree murder on the alternate theories of premeditation, felony murder in the commission of a burglary, and felony murder in the commission of a sexual battery. See id. From the time of the first appeal, Lightbourne has attacked the reliability of Theodore Chavers and Theophilus Carson, two jailhouse informants, who testified to incriminating statements allegedly made by Lightbourne regarding the circumstances of the murder.
During the penalty phase, the State did not put on any additional testimony, but rather relied on the evidence presented during the guilt phase, including the testimony of Chavers and Carson. This Court recounted their testimony in its 1999 opinion:
Theodore Chavers, a cellmate in the Marion County Jail, testified that [Lightbourne] "knew too much" about the details of Nancy's death and made some incriminating statements during the course of their conversations. According to Chavers, petitioner made references indicating that he entered Nancy's house, encountered her as she was coming out of the shower, forced her to engage in sexual intercourse, and shot her despite pleas for mercy. This version of the facts was corroborated by Theophilus Carson, another cellmate in the Marion County Jail. According to Carson, petitioner admitted forcing Nancy to have sex, shooting her because she could identify him, and taking a necklace and some money.
Id. at 240 (footnotes omitted) (quoting Lightbourne v. Dugger, 829 F.2d 1012, 1016 (11th Cir.1987)).
The jury recommended the death penalty and the trial court imposed a death sentence. The trial court found the following aggravating circumstances: (1) the murder was committed during the commission *434 of a burglary and sexual battery; (2) the murder was committed to avoid arrest; (3) the murder was committed for pecuniary gain; (4) the murder was heinous, atrocious or cruel ("HAC"); and (5) the murder was committed in a cold, calculated and premeditated manner ("CCP"). See id. at 241. The trial court found only two mitigating circumstances: (1) no significant history of criminal activity; and (2) Lightbourne's relative youth at the time of the crime. See id.
On direct appeal, Lightbourne asserted that his statements to Chavers and Chavers' subsequent testimony regarding those statements were solicited by authorities in violation of United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), which prohibits the admission of statements deliberately elicited from the defendant by a government agent in violation of the Sixth Amendment right to counsel. See Lightbourne v. State, 438 So.2d 380, 386 (Fla.1983). Lightbourne maintains that Chavers acted as an agent for the State when he questioned Lightbourne about the murder while he and Lightbourne were in the same jail cell. This Court rejected Lightbourne's Henry claim, see id., as did the Eleventh Circuit when Lightbourne raised the same claim in a federal habeas corpus petition. See Lightbourne v. Dugger, 829 F.2d 1012, 1021 (11th Cir.1987).
In his second postconviction motion,[1] Lightbourne attacked the reliability of Chavers and Carson, and sought to introduce affidavits and other exculpatory information concerning the two informants. See Lightbourne v. Dugger, 549 So.2d 1364, 1365 (Fla.1989). These affidavits included one from Chavers in which he recanted his trial testimony. See id. Lightbourne contended that he was entitled to a new trial as a result of this newly discovered evidence and Brady[2] violations based on the State's failure to disclose that police engaged in a scheme with Chavers and Carson to elicit incriminating statements from Lightbourne. See id. The trial court summarily denied the motion for postconviction relief, and this Court reversed for an evidentiary hearing. See id. at 1367.
After an evidentiary hearing, the trial court denied relief and this Court affirmed the trial court's order denying relief. See Lightbourne v. State, 644 So.2d 54 (Fla. 1994). In the opinion, this Court referred to the testimony of Richard Carnegia, another prisoner who was in the same cell as Lightbourne, as the only evidence "corroborating" Lightbourne's proffered hearsay evidence.[3]See id. at 57 n. 4.
In 1994, Lightbourne filed his third postconviction motion based upon the affidavits of Carson and Larry Emanuel, who also were in the same jail cell as Lightbourne. Carson alleged in his affidavit, *435 consistent with Chavers' affidavit, that he testified falsely at trial under pressure from the State. Further, Emanuel, who did not testify at trial, swore in his affidavit that he had been solicited by the police to testify against Lightbourne and that "the other guys in the cell" also were promised leniency on their charges for testimony against Lightbourne. Emanuel stated that "one of those guys was Uncle Nut Chavers," referring to Chavers. Lightbourne alleged that these affidavits established violations of Brady, Henry and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), or, in the alternative, constituted newly discovered evidence that would probably produce a different result on retrial.
The trial court held an evidentiary hearing on Lightbourne's claims. At this hearing, Carson testified and again recanted his trial testimony. However, the trial court concluded that Carson's recanted testimony was not believable, based in large part on testimony by police officers that there had been no deal. The trial court did not allow Emanuel to testify because it concluded that Emanuel's testimony was procedurally barred in that it could have been presented earlier.
In this Court's 1999 opinion, we concluded that Emanuel's testimony was not procedurally barred. See Lightbourne, 742 So.2d at 246. We remanded the case for an evidentiary hearing to consider Emanuel's and Carnegia's testimony in deciding whether Carson's recanted testimony would probably produce a different result on resentencing, and whether Emanuel's and Carnegia's testimony supports Lightbourne's claim that Chavers' and Carson's testimony at the original trial was false or motivated by an undisclosed deal with the State. See id. at 249.

MOST RECENT PROCEEDINGS
Following our reversal for further proceedings, the trial court held an evidentiary hearing. Pursuant to the remand, the evidentiary hearing in this case was limited to the consideration of Larry Emanuel's testimony, as well as evaluation of the cumulative effect of all the post-trial evidence presented over the past twenty years to determine whether a new penalty phase was required under Lightbourne's Brady or newly discovered evidence claims. At the hearing, Emanuel alleged that he never heard Lightbourne confess to the murder. Lightbourne presented Emanuel's testimony in an attempt to corroborate Chavers' and Carson's claim that they were solicited by the State to act as informants, and to corroborate the veracity of Carson's and Chavers' recantations.
After conducting an evidentiary hearing, the trial court denied Lightbourne's postconviction motion. The trial court stated:
Considering the testimony of Larry Emanuel and the cumulative effect of all evidence in the record, the total picture is abundantly clear that all the jailhouse informants were acting out of self interest and hope of personal gain and that none of them were acting as agents solicited by the State. It is equally clear that much of their testimony is inconsistent, contradictory, and just not worthy of much belief. It appears that they solicited each other, in an effort to bolster their own credibility and/or to gain favor among themselves, rather than being solicited by law enforcement.
Their lack of credibility was adequately attacked by defense at trial and the penalty phase. No reasonable juror would place much credence in the testimony of these informants, except such as is corroborated by independent evidence.

*436 The Court finds that the testimony of Larry Emanuel, by itself and together with all other post-trial evidence, adds nothing of value to Mr. Lightbourne's claim that Theodore Chavers and Theophilius Carson were acting as agents for law enforcement in soliciting statements from Mr. Lightbourne. To the contrary, Emanuel's testimony shows that these informants were acting on their own and that he, and probably others, would say most anything to help themselves. Emanuel's testimony is so lacking in credibility that it is clear why the State did not call him as a witness at trial.
Considering the testimony of Larry Emanuel, by itself and together with all other post-trial evidence, the Court finds as follows:
1. That Theodore Chavers and Theophilius Carson were not acting as agents for law enforcement in soliciting statements from Ian Lightbourne.
2. That the State's use of jail informant testimony did not violate Ian Lightbourne's right to counsel.
3. That there is no reasonable probability that a new penalty phase hearing would result in a different result as to the imposition of the death penalty.
4. That the presentation of this new evidence at a new penalty phase hearing would probably not produce a different result.
Therefore, the Court finds that the Defendant's Motion to Vacate Judgment and Sentence and Special Request For Leave to Amend, filed 17 November 1994, should be and is hereby DENIED.
Lightbourne appeals the trial court's denial of his postconviction motion, raising three issues.[4]

ANALYSIS
As noted above, in our 1999 opinion we remanded this case for an evidentiary hearing "as to Emanuel's testimony and for the trial court to consider the cumulative effect of the post-trial evidence in evaluating the reliability and veracity of Chavers' and Carson's trial testimony in determining whether a new penalty phase hearing is required, either under Lightbourne's Brady or newly discovered evidence claims." Lightbourne, 742 So.2d at 249. Furthermore, we explained that in conducting a cumulative error analysis, the trial court must "`consider all newly discovered evidence which would be admissible' at trial." Id. at 247 (quoting Jones v. State, 709 So.2d 512, 521-22 (Fla.1998)) (emphasis supplied).
Lightbourne contends that, in light of the record as it now stands, he is entitled to relief because he has established: (1) that the State presented false evidence in violation of Giglio; (2) that the State's use of Chavers and Carson as agents violated Henry; (3) that the State withheld material evidence pertaining to Giglio and Henry in violation of Brady; and (4) that the recantations of all the jailhouse informants constitutes newly discovered evidence.

*437 BRADY CLAIM

In order to establish a Brady violation, a defendant must prove:
[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). For Brady purposes, in order to constitute prejudice, the information must have been material. See Strickler, 527 U.S. at 282, 119 S.Ct. 1936. Furthermore:
[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.
Jones v. State, 709 So.2d 512, 519 (Fla. 1998) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). In other words, a Brady violation is established by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Jones, 709 So.2d at 519 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Further, the cumulative effect of the suppressed evidence must be considered when determining materiality. See Way, 760 So.2d at 913 (citing Kyles, 514 U.S. at 436 & n. 10, 115 S.Ct. 1555). "It is the net effect of the evidence that must be assessed." Way, 760 at 913 (quoting Jones, 709 So.2d at 521); see Kyles, 514 U.S. at 436 & n. 10, 115 S.Ct. 1555.
Lightbourne's Brady claim, and the interrelated nature of the Giglio and Henry claims, were explained in our 1999 opinion:
A Henry violation is established when police improperly use a jailhouse informant to elicit statements from a defendant in violation of his Sixth Amendment right to counsel, see 447 U.S. at 274, 100 S.Ct. 2183, and Giglio is violated when the state knowingly presents false testimony. See 405 U.S. at 154-55, 92 S.Ct. 763. Because Lightbourne's Brady claim is based on the alleged violations of Henry and Giglio, unless Carson's recanted testimony that the police solicited and used his false testimony is credible, Lightbourne's Brady claim cannot be established.

Lightbourne, 742 So.2d at 247 (footnote omitted) (emphasis supplied).
In explaining the cumulative effect of the proposed testimony as it relates to Carson and Chavers, this Court observed in its 1999 opinion:
The cumulative effect of the evidence relates to the veracity of the trial testimony of Carson and Chavers. When considering Lightbourne's Henry claim in our original opinion, this Court stated that without "some other evidence of prearrangement aimed at discovering incriminating information," we were "unwilling to elevate the state's actions in this case to an agency relationship with the informant Chavers." Lightbourne, 438 So.2d at 386
Lightbourne, 742 So.2d at 248.
In reviewing Lightbourne's Brady claims, this Court defers to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but reviews de novo the application of those facts to the law. See Stephens v. State, 748 So.2d 1028, 1031-32 (Fla.1999); see also Rogers v. State, 782 So.2d 373, 376 (Fla.2001) (citing *438 Stephens as standard of review applicable to Brady analysis). In this case, the trial court concluded that Emanuel's testimony that he was solicited by the police to speak to Lightbourne was not believable. We conclude that the trial court's finding regarding Emanuel's credibility is supported by competent, substantial evidence. See Way, 760 So.2d at 914-15 (explaining that competent, substantial evidence supported trial court's finding that witness lacked credibility, and therefore defendant failed to establish Brady violation).
At the 1999 evidentiary hearing, Emanuel testified that in January 1981 he was in the same jail cell as Lightbourne. Emanuel stated that Officers Eddie Scott and Keith Raym asked him to get information from Lightbourne regarding the murder, and Emanuel agreed to assist the agents. Emanuel testified that Scott and Raym told him that his burglary charge would be dropped if he could get a statement from Lightbourne. Emanuel told the officers that he heard Lightbourne confess. Emanuel claims that after he told the authorities about Lightbourne's confession his charges were dropped.[5]
In contrast to Emanuel's testimony that Officers Scott and Raym approached him about obtaining information on Lightbourne, both officers testified in the 1995-1996 evidentiary hearing that neither of them were involved in the Lightbourne case, and that neither had met with Emanuel concerning the Lightbourne case.[6] Moreover, the State on cross-examination of Emanuel at the 1999 hearing elicited that Emanuel had been convicted of six felonies as an adult.
Emanuel's contradictory responses to several questions also supports the trial court's assessment of his credibility. For example, although on direct examination Emanuel stated that he told the police that he heard Lightbourne confess, he stated on cross-examination that he did not remember giving a statement to the police concerning Lightbourne. Several questions later, Emanuel stated that he did not tell the officers about Lightbourne. Finally, on redirect examination, Emanuel again stated that he spoke with Scott and Raym about the Lightbourne case. Moreover, when asked on cross-examination why he waited so long to "tell the truth," Emanuel somewhat evasively responded, "I know that Chavers is a big liar, and he would, he would tell a lie to save himself or get out of jail, and wouldn't care who he hurt in the process. And I was sitting there and never did hear him say that. But that's all I got to say on that case."
Emanuel's testimony also conflicts in material ways with the testimony that Richard Carnegia gave at the 1990-91 evidentiary hearing. For example, Carnegia testified that in January and February of 1981, he was in the same jail cell as Lightbourne, Chavers, and Emanuel.[7] Carnegia explained that Lightbourne and Chavers were already in the cell when Carnegia arrived. Carnegia stated that he was solicited by Chavers, rather than the *439 State, to lie about hearing Lightbourne confess to the murder. Carnegia explained that he refused to go along with Chavers' request because he "didn't want to say something that I didn't hear. You know, it wasn't true." Carnegia explained that Chavers told him that it would be more believable if Chavers had more "to support his word." Furthermore, in contrast to Emanuel's testimony that the police solicited him, Carnegia stated that he heard Chavers ask Emanuel to assist him in providing information against Lightbourne, but Carnegia could not hear Emanuel's response.
Moreover, as the trial court recognized, cumulatively the statements of Emmanuel and Carnegia "add[ ] nothing of value to... Lightbourne's claim that ... Chavers and ... Carson were acting as agents for law enforcement" or were untruthful at trial. Neither Carnegia nor Emanuel ever expressly stated that Chavers lied to the police, or that Chavers lied in his trial testimony. Neither Emanuel nor Carnegia discussed Carson's trial testimony or commented upon whether Carson's trial testimony was truthful. Finally, neither Emanuel nor Carnegia testified that the State solicited Chavers or Carson to act as agents in soliciting information from Lightbourne.
Therefore, we conclude that the trial court's finding that Emanuel and Carnegia lacked credibility is supported by competent, substantial evidence. Furthermore, a cumulative analysis does not support Lightbourne's claim that Carson and Chavers were acting as state agents or were untruthful at trial. Accordingly, we reject Lightbourne's Brady claim.

NEWLY DISCOVERED EVIDENCE
While we affirm the trial court's rejection of the Brady claim, we must separately analyze Lightbourne's newly discovered evidence claim. As the Court explained in its 1999 opinion:
However, even if Carson's testimony does not establish a Brady violation, it nonetheless may qualify as newly discovered evidence that the trial court should evaluate, in light of the other evidence adduced since trial, to determine whether it would probably produce a different result. See State v. Spaziano, 692 So.2d 174, 176 (Fla.1997); Armstrong v. State, 642 So.2d 730, 735 (Fla.1994). In Armstrong, we explained that recanted testimony can be considered newly discovered evidence, but in making that determination, the trial court must examine "all the circumstances of the case." 642 So.2d at 735 (emphasis supplied). We cautioned, however, that recanted testimony is "exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true." Id. Only where the recanted testimony is of such nature that a different verdict would probably be rendered should a new trial be granted. See id.
In this case the trial court concluded that Carson's recanted testimony would not probably produce a different result on retrial. In making this determination, the trial court did not consider Emanuel's testimony, which it had concluded was procedurally barred, and did not consider Carnegia's testimony from a prior proceeding. The trial court cannot consider each piece of evidence in a vacuum, but must look at the total picture of all the evidence when making its decision.
Lightbourne, 742 So.2d at 247.
This Court has articulated the following two requirements that must be satisfied in order to set aside a conviction or sentence on the basis of newly discovered evidence:

*440 First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or his counsel could not have known [of it] by the use of diligence."
Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
Jones, 709 So.2d at 521 (citations omitted).
We have already determined that the newly discovered evidence claim would be foreclosed as to the guilt phase in our prior opinion in Lightbourne:
[E]ven assuming the credibility of all of the post-trial evidence and that a Brady claim has been established, and even assuming that Chavers' and Carson's trial testimony had been excluded under Henry or that Chavers and Carson had not even testified, we do not find that there is a "reasonable probability" of a different result in the guilt phase under Lightbourne's Brady claim, nor, if considered as newly discovered evidence, would the evidence "probably produce an acquittal on retrial." Even without Chavers' and Carson's testimony, the evidence overwhelmingly supports a conviction of guilt.
Lightbourne, 742 So.2d at 248 (citations omitted).
In the context of a claim regarding newly discovered evidence as to the penalty phase, the standard for the second prong of Jones is whether the newly discovered evidence is of such a nature that it would probably produce a life sentence. See Jones v. State, 591 So.2d 911, 915 (Fla. 1991) ("[N]ewly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. The same standard would be applicable if the issue were whether a life or a death sentence should have been imposed."); see also Mills v. State, 786 So.2d 547, 549-50 (Fla. 2001) (same); Kight v. State, 784 So.2d 396, 399 (Fla.2001) (stating that trial court properly denied relief because newly discovered evidence would probably not have produced a life sentence during a new penalty phase).
In determining whether the second prong of the Jones standard has been satisfied in postconviction proceedings, we have explained the proper analytical framework for the court to employ:
To reach this conclusion the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at the trial."
In considering the second prong, the trial court should initially consider whether the evidence would have been admissible at trial or whether there would have been any evidentiary bars to its admissibility. Once this is determined, an evaluation of the weight to be accorded the evidence includes whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence. Where, as in this case, some of the newly discovered evidence includes the testimony of individuals who claim to be witnesses to events that occurred at the time of the crime, the trial court may consider both the length of the delay and the reason the witness failed to come forward sooner. *441 Jones, 709 So.2d at 521-22 (citations omitted); see also Kight, 784 So.2d at 401-03 (analyzing probable impact of newly discovered evidence on penalty phase under second prong of Jones in successive postconviction motion).
Furthermore, with regard to claims of newly discovered evidence involving recanted testimony, this Court has explained:
In assessing recanted testimony, we have stressed caution, noting that it may be unreliable and trial judges must "examine all of the circumstances in the case." Accordingly, "[r]ecantation by a witness called on behalf of the prosecution does not necessarily entitle a defendant to a new trial." That is the purpose of an evidentiary hearing.
Robinson v. State, 707 So.2d 688, 691 (Fla. 1998) (citations omitted).
In this case, we conclude the trial court did not err in rejecting Lightbourne's newly discovered evidence claim. The trial court explained:
Considering the testimony of Larry Emanuel and the cumulative effect of all evidence in the record, the total picture is abundantly clear that all the jailhouse informants were acting out of self interest and hope of personal gain and that none of them were acting as agents solicited by the State. It is equally clear that much of their testimony is inconsistent, contradictory, and just not worthy of much belief.
As noted above regarding Lightbourne's Brady claim, the trial court's determination that Emanuel lacked credibility is supported by competent, substantial evidence. Further, in 1994, the trial court concluded that Carson was not credible. See Lightbourne, 742 So.2d at 249. In our 1999 opinion, we directed the trial court to re-evaluate Carson's, Chavers' and Carnegia's credibility in light of Emanuel's testimony and the cumulative effect of all the post-trial evidence. See id. at 245. In considering the cumulative effect of Emanuel's testimony along with all the other evidence of record, the trial court concluded that the testimony of all the jailhouse informants was "just not worthy of much belief." This finding of the trial court is also supported by competent, substantial evidence. Thus, since the trial court has now determined that Emanuel is not credible and has now re-evaluated the prior recantations of Carson, Chavers, and Carnegia, the trial court has performed the requisite cumulative analysis that we directed be conducted.
Moreover, the second prong of Jones for a newly discovered evidence claim requires a probability of a different result. In this case, that would mean a probability of a life sentence. The trial court found:
Considering the testimony of Larry Emanuel, by itself and together with all other post-trial evidence, the Court finds... [t]hat there is no reasonable possibility that a new penalty phase hearing would result in a different result as to the imposition of the death penalty.
We acknowledged in our last opinion that Chavers' and Carson's testimony "may have formed the basis of at least three of the aggravators found by the trial courtHAC, CCP and committed to avoid arrest." Lightbourne, 742 So.2d at 249. In particular, we expressed concern that their "graphic" testimony may have played a role in establishing two of these aggravatorsHAC and committed to avoid arrest. Id. However, to succeed in a newly discovered evidence claim, Lightbourne has the burden of establishing the probability that a life sentence would have been imposed.
First, even though Chavers and Carson gave details of Lightbourne's alleged confession, the trial court determined that *442 their testimony was substantially impeached at the original trial. Also, in the appeal of Lightbourne's first postconviction motion, this Court has also acknowledged that the credibility of these informants was sufficiently attacked at trial. See Lightbourne, 471 So.2d at 29 ("The record clearly indicated that the credibility of the jailhouse informants was specifically attacked by defense counsel on cross examination and by pretrial motion."). Thus, given that the credibility of Carson and Chavers was sufficiently undermined during the original trial, there is not a reasonable probability that a second penalty phase again attacking the credibility of the same witnesses would produce a different result.
Second, even assuming the recantations of Chavers and Carson are credible, Lightbourne's death sentence remains supported by three aggravators that could have been independently establishedduring the commission of a burglary and sexual battery, for pecuniary gain, and CCP. For example, evidence at trial revealed that the telephone wires to Nancy O'Farrell's house had been cut, pubic hair matching Lightbourne's and semen consistent with his blood type were found on O'Farrell's body, and Lightbourne was found in the possession of a necklace belonging to O'Farrell. See Lightbourne, 742 So.2d at 240 nn. 1-2. Furthermore, in this case, there was relatively weak mitigation. See id. at 241. Accordingly, even assuming the reliability of Carson's and Chavers' recantations, in light of the substantial aggravation and the lack of mitigation in this case, we further conclude that the trial court's finding that Lightbourne has not established a reasonable probability that a life sentence would have been imposed is supported by competent, substantial evidence. Therefore, we reject Lightbourne's newly discovered evidence claim.

EMANUEL'S PREVIOUS REPRESENTATION BY STATE ATTORNEY BLACK
In Lightbourne's second claim on appeal, he asserts that his due process and equal protection rights were violated because Assistant State Attorney Reginald Black, who represented the State in several of Lightbourne's postconviction proceedings, previously had represented Emanuel in an unrelated case. Specifically, Lightbourne claims that during Black's representation of Emanuel, Emanuel told Black about Emanuel's involvement in Lightbourne's case. We conclude that this claim is procedurally barred. Lightbourne raised this issue in his last postconviction motion. Although the Court acknowledged the issue in its 1999 opinion, see Lightbourne, 742 So.2d at 245, it did not address the issue. However, Lightbourne did not seek rehearing based upon this Court's failure to address this issue. Therefore, because Lightbourne did not seek rehearing on this issue, we conclude that Lightbourne has abandoned this claim. See Garcia v. State, 816 So.2d 554, 569 (Fla.2002).[8]
Accordingly, we affirm the trial court's denial of postconviction relief.
It is so ordered.
ANSTEAD, C.J., WELLS, PARIENTE, LEWIS, QUINCE, and CANTERO, JJ., and SHAW, Senior Justice, concur.
*443 PARIENTE, J., concurs specially with an opinion, in which SHAW, Senior Justice, concurs.
PARIENTE, J., concurring specially.
I concur with the majority, but write separately to highlight that in this case the multiple postconviction proceedings primarily resulted from the jailhouse informants' recantations of their testimony. I recognize that in some instances the State may have no alternative but to present the testimony of these informants in order to secure a conviction. However, our experience with postconviction motions in death penalty proceedings has demonstrated that these jailhouse informants (so-called "jailhouse snitches") are often unreliable and untrustworthy. Most importantly, just as the jailhouse snitches may be willing to stretch the truth in their own self-interest at the time of trial at the behest of the State, following trial they may be just as willing to recant at the behest of the defendant.[9]
Overall, because of the substantial risk of recantation, the State's reliance on jailhouse informants to obtain convictions has the potential for impacting both the finality of convictions and the integrity of the judicial process. In this case, there was substantial independent evidence to support the finding of guilt and the imposition of the death sentence without the testimony of the informants.
While I certainly understand that the State is presented with difficult tactical choices at trial, I urge the State to consider the potential long-term impact effects on the finality of the conviction when deciding whether to present the testimony of jailhouse snitches.[10] In this case, the recantations of the jailhouse informants have resulted in nearly twenty years of postconviction proceedings that have cast a cloud over Lightbourne's death sentence.
SHAW, Senior Justice, concurs.
NOTES
[1] In his first postconviction motion, Lightbourne asserted that trial counsel was ineffective for failing to impeach the jailhouse informants. See Lightbourne v. State, 471 So.2d 27, 29 (Fla.1985). This Court rejected that claim. See id.
[2] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[3] The trial court also concluded that Chavers and Carson were unavailable witnesses, a finding that we affirmed:

Carson could not be located despite a diligent search. At the hearing, Chavers appeared to testify but demonstrated great difficulty answering questions. After a medical and psychological evaluation, he was found incompetent to testify. His testimony was deferred, and when he testified three months later, he professed to have a lack of memory and refused to answer questions. Chavers was found in contempt of court and declared unavailable as a witness.
Lightbourne, 644 So.2d at 56.
[4] Lightbourne raises the following claims in this appeal: (1) he was denied a reliable adversarial testing because the State withheld material exculpatory evidence and presented false testimony in violation of his constitutional rights. In the alternative, newly discovered evidence establishes that Lightbourne's death sentence is unreliable and that he is entitled to a new sentencing; (2) Lightbourne's constitutional rights were violated by the participation of Assistant State Attorney Reginald Black as counsel for the State because Black represented Larry Emanuel and was thus a necessary and material witness to Lightbourne's claims regarding Emanuel; and (3) the trial court erred in denying collateral counsel's motion to withdraw due to a conflict of interest.
[5] Although there was some confusion between the State and the defense at the 1999 evidentiary hearing regarding Emanuel's prior convictions, it appears that on April 13, 1981, Emanuel was given eighteen months in prison on a violation of probation charge. It also appears that a corresponding burglary charge was dropped, but the date this charge was dropped is not clear from the record.
[6] Scott did state that he had met with Emanuel concerning the Sonny Boy Oats case, in which Emanuel was implicated as a codefendant. The testimony indicates that this meeting occurred around the time that Emanuel alleges he spoke to Scott and Raym about the Lightbourne case.
[7] He did not remember whether Carson was in the same cell.
[8] In Lightbourne's third claim he argues that the trial court erred in denying collateral counsel Todd Scher's motion to withdraw due to a conflict of interest. We have considered this claim and determine that Lightbourne is not entitled to relief on this issue.
[9] See, e.g., Sweet v. State, 810 So.2d 854, 870 (Fla.2002) (noting trial court's order regarding credibility of informant, who had recanted and was now serving a life sentence, admitted that "snitches are not highly regarded in prison, and that the inmates consider it an admirable thing to testify on behalf of another inmate").
[10] Indeed, due to the suspect nature of jailhouse testimony and the question mark such testimony has left on the reliability of Illinois' death convictions, the State of Illinois Governor's Commission on Capital Punishment has recommended that its police, prosecutors, capital case defense attorneys, and judges receive periodic training on the risk of false testimony by in-custody informants. See State of Illinois, Report of the Governor's Commission of Capital Punishment, at 21, 27, 28 (2002).