# Supreme Court of Florida

_____

Nos. SC20-934 & SC20-1529

_____

**JAMES MILTON DAILEY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

**JAMES MILTON DAILEY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 23, 2021

PER CURIAM.

James Milton Dailey, a prisoner under sentence of death, appeals the circuit court's orders denying in part and dismissing in part his fourth successive motion for postconviction relief and dismissing his fifth successive motion for postconviction relief, which were filed under Florida Rule of Criminal Procedure 3.851,

and dismissing his motion to perpetuate the testimony of Jack

Pearcy.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For

the reasons that follow, we affirm.

## I.  BACKGROUND

Dailey was convicted of and sentenced to death for the murder

of Shelly Boggio.  The facts of the crime have been described as

follows:

> Shelley Boggio's nude body was found floating in the water near Indian Rocks Beach in Pinellas County, Florida.  She had been stabbed repeatedly, strangled, and drowned.  On the day of the murder, Shelley, her twin sister Stacey, and Stephanie Forsythe had been hitchhiking along a road near St. Petersburg, Florida.  They were picked up by Dailey, Jack Pearcy, and Dwayne "Oza" Shaw.  The three men drove the girls to a local bar. Stacey and Stephanie returned home shortly thereafter, but Shelley remained with the group and returned to Jack Pearcy's house.  Dailey was living in Pearcy's home, where he had his own bedroom.  Pearcy and his girlfriend, Gayle Bailey, shared a second bedroom.  Shaw, a friend of Pearcy's from Kansas, was temporarily staying at Pearcy's house while he resolved marital issues.  He slept on a couch in the living room.
> Shaw testified that on the night of the murder he drove with Pearcy and Boggio to a public telephone booth, where he was dropped off.  Pearcy and Boggio then drove off alone.  After speaking on the phone for several minutes, Shaw returned to the house on foot and fell asleep on the couch.  Shaw testified that when he woke up later that night, he saw Pearcy and Dailey, but not Boggio, entering the house together.  Shaw noticed that Dailey's pants were wet.

The State presented testimony from the lead detective in the case, John Halladay, and three informants who were inmates at the same facility where Dailey was held while awaiting trial.

*Dailey v. State*, 965 So. 2d 38, 41-42 (Fla. 2007). The three inmates testified that Dailey had admitted the killing to them individually and had devised a plan whereby he would later confess when Pearcy's case came up for appeal if Pearcy in turn would promise not to testify against him at his own trial. *Dailey v. State*, 594 So. 2d 254, 256 (Fla. 1991). Pearcy was tried first, convicted of first-degree murder, and sentenced to life imprisonment. *Id.* He refused to testify at Dailey's subsequent trial. *Id.* Dailey presented no evidence during the guilt phase. *Id.* He was found guilty of first-degree murder, and the jury unanimously recommended death. *Id.* At sentencing, Dailey requested the death penalty, and the court sentenced him to death. *Id.*

We upheld the conviction on direct appeal, but reversed the sentence, concluding that the trial judge had failed to give weight to mitigating circumstances, and that two aggravators were unsupported. *Dailey*, 594 So. 2d at 255, 258-59. On remand, the trial court once again sentenced Dailey to death, and we affirmed.

*Dailey v. State*, 659 So. 2d 246, 247, 248 (Fla. 1995). Dailey's conviction and sentence became final in 1996, when the United States Supreme Court denied his petition for a writ of certiorari. *Dailey v. Florida*, 516 U.S. 1095 (1996).

Thereafter, we affirmed the denial of Dailey's initial motion for postconviction relief and denied his petition for a writ of habeas corpus. *Dailey*, 965 So. 2d at 41. We also affirmed the denial of his first successive motion for postconviction relief, *Dailey v. State*, 247 So. 3d 390, 391 (Fla. 2018), the denial in part and dismissal in part of his second successive motion, *Dailey v. State*, 279 So. 3d 1208, 1212 (Fla. 2019), *cert. denied*, 141 S. Ct. 689 (2020), and the denial in part and dismissal in part of his third successive motion, *Dailey v. State*, 283 So. 3d 782, 787 (Fla. 2019), *cert. denied*, 141 S. Ct. 234 (2020). We also denied another petition for a writ of habeas corpus and a motion for a stay of execution. *Id.*

On December 27, 2019, Dailey filed his fourth successive postconviction motion, alleging that a 2019 declaration from Jack Pearcy is newly discovered evidence that proves that Pearcy alone murdered Boggio. Pearcy was deposed on February 25, 2020, in advance of the evidentiary hearing. At the end of the deposition,

- 4 -

Pearcy indicated that he had answered every question, had nothing more to say, and did not want to be brought back to court to testify in Dailey's case. At the evidentiary hearing in March 2020, Pearcy again refused to testify, as he has at past postconviction evidentiary hearings involving similar claims. Neither the judge, the attorneys, nor Pearcy's mother and stepfather were able to persuade him to testify.

The trial court subsequently entered an order denying in part and dismissing in part Dailey's fourth successive motion. With regard to the Pearcy claim, the court found that Dailey did not present any admissible evidence to support his claim that Pearcy confessed to committing the murder himself even if the court were to have considered Pearcy's deposition. The court dismissed as procedurally barred Dailey's claims that former trial prosecutor Robert Heyman had knowledge of Paul Skalnik's prior child sexual assault charge but allowed Skalnik's false testimony to stand uncorrected, and that newly discovered evidence established that Heyman committed fraud upon the court.

After filing his notice of appeal of the denial of his fourth successive motion, Dailey filed a fifth successive postconviction

motion.  We temporarily relinquished jurisdiction for resolution of the fifth successive motion by the trial court.  Dailey also filed in the trial court a motion to take a deposition to perpetuate Pearcy's testimony.  After hearing argument from the parties, the trial court entered an order dismissing Dailey's fifth successive motion and the motion to perpetuate Pearcy's testimony.  The trial court found Dailey's fifth successive motion untimely and noted that Dailey still had not obtained Pearcy's testimony in an admissible form.  The trial court dismissed the motion to perpetuate as moot in light of the dismissal of the fifth successive motion.  Dailey now appeals the denial/dismissals of his fourth and fifth successive motions and the dismissal of his motion to perpetuate.

## II.  ANALYSIS

### A.  Heyman's "Admission"

Dailey first argues that the trial court erred in summarily denying his *Giglio*[1] claim regarding former Assistant State Attorney Heyman's notes from Dailey's 1987 trial, which he alleges prove that the State knowingly elicited false testimony from Paul Skalnik

---

1.  *Giglio v. United States*, 405 U.S. 150 (1972).

and failed to correct it, specifically, Skalnik's testimony "that his prior criminal charges were 'grand theft, counselor, not murder, not rape, no physical violence in my life.' " Dailey claims that the notes tracked the testimony of Detective Halliday, who testified after Skalnik at the trial, and had the words "sex assault(s)" crossed-out in regard to Skalnik's criminal history. Because Skalnik was arrested in 1982 on a charge of lewd and lascivious assault on a child under fourteen, for which a "no information" was subsequently filed by the same State Attorney's office that prosecuted Dailey's case, Dailey asserts that the notes and Heyman's "admission" to a reporter in 2020 that the notes were his and that they were made during Dailey's trial in 1987 prove that the State knew Skalnik testified falsely about his prior charge and allowed that false testimony to stand uncorrected, in violation of *Giglio*.[2]

---

2. A *Giglio* claim alleges that a prosecutor knowingly presented false testimony against the defendant. *Hunter v. State*, 29 So. 3d 256, 270 (Fla. 2008) (citing *Giglio*, 405 U.S. at 153). "A *Giglio* violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." *Green v. State*, 975 So. 2d 1090, 1106 (Fla. 2008) (citing *Guzman v. State*, 941 So. 2d 1045, 1050 (Fla. 2006)). False testimony is

Florida Rule of Criminal Procedure 3.851(f)(5)(B) permits the denial of a successive postconviction motion without an evidentiary hearing "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Because a postconviction court's decision regarding whether to grant a rule 3.851 evidentiary hearing depends on the written materials before the court, its ruling essentially constitutes a pure question of law and is subject to de novo review. *Grossman v. State*, 29 So. 3d 1034, 1042 (Fla. 2010). In reviewing a trial court's summary denial of a motion for postconviction relief, this Court accepts the allegations in the motion as true to the extent that they are not conclusively rebutted by the record. *Hodges v. State*, 885 So. 2d 338, 355 (Fla. 2004).

The trial court did not err in dismissing this claim as untimely and procedurally barred. This claim is merely a repackaging of the claim in Dailey's 2017 successive motion that *Giglio* was violated based on Skalnik's false testimony about his criminal history at Dailey's trial. In 2017, Dailey alleged "that the State failed to

material "if there is a reasonable possibility that it could have affected the jury's verdict." *Id.*

correct Paul Skalnik's false trial testimony about his criminal history. At trial, Skalnik testified that the charges against him were 'grand theft . . . not murder, not rape, no physical violence in my life.' " *Dailey*, 279 So. 3d at 1216-17. Dailey asserted "that this testimony is a significant understatement of Skalnik's criminal history because it omits that Skalnik had previously been charged with lewd and lascivious [assault] on a child under fourteen years of age." *Id.* at 1217.

A *Giglio* claim alleges that a prosecutor knowingly presented false testimony against the defendant. The alleged false testimony in the 2017 claim and the instant claim is the same: Skalnik testified that his charges were "grand theft, . . . not murder, not rape, no physical violence in my life." Both *Giglio* claims allege that the same testimony is false. That Dailey now knows that Heyman authored the notes does not change the fact that the alleged false testimony is the same as it was in 2017. It is also irrelevant whether Heyman had actual knowledge that Skalnik's testimony was false because that knowledge would have been imputed to Heyman even if he did not have actual knowledge. *E.g., Gorham v. State*, 597 So. 2d 782, 784 (Fla. 1992) (holding that the prosecutor

- 9 -

is charged with constructive knowledge of evidence withheld by other state agents).

Even if this claim were timely and not barred, it is without merit because information regarding Skalnik's lewd and lascivious assault charge is immaterial under *Giglio*. As we stated in affirming the denial of Dailey's 2017 claim regarding Skalnik's lewd and lascivious assault charge,

> Even assuming he could establish the first two prongs of *Giglio*, Dailey's first claim fails because Skalnik's testimony about his criminal history was not material. Dailey suggests that the jury would be less likely to believe Skalnik's testimony about Dailey if it knew of the lewd and lascivious [assault] charge. But Skalnik's credibility was already compromised because the jury was aware that he had committed multiple crimes. And Skalnik was not the only witness against Dailey; two other inmates also testified that Dailey confessed to the murder. *Dailey*, 594 So. 2d at 256. Accordingly, there is no reasonable possibility that information regarding Skalnik's lewd and lascivious assault charge would have affected the jury's verdict.

*Dailey*, 279 So. 3d at 1217. There is still no reasonable possibility that information regarding Skalnik's lewd and lascivious assault charge would have affected the jury's verdict. Heyman's notes have no impact on the materiality of Skalnik's testimony. Thus, Dailey

- 10 -

cannot meet the *Giglio* materiality prong and is therefore not entitled to relief on the merits of this claim.

Dailey also argues that the trial court erred in denying his claim that Heyman's "admission" regarding his notes constitutes newly discovered evidence warranting relief. The trial court also summarily denied this claim on the basis that it is procedurally barred and that Heyman's "admission" did not qualify as newly discovered evidence.

In order to obtain relief based on newly discovered evidence, a defendant must establish: (1) that the newly discovered evidence was unknown by the trial court, by the party, or by counsel at the time of trial and it could not have been discovered through due diligence, and (2) that the evidence is of such a nature that it would probably produce an acquittal or yield a less severe sentence on retrial. *Davis v. State*, 26 So. 3d 519, 526 (Fla. 2009) (citing *Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (*Jones II*); *Jones v. State*, 591 So. 2d 911, 915 (Fla. 1991) (*Jones I*)). Newly discovered evidence satisfies the second prong of the test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt

- 11 -

as to his culpability." *Jones II*, 709 So. 2d at 526 (quoting *Jones I*, 678 So. 2d at 315).

The trial court did not err in summarily denying this claim because Dailey cannot establish that Heyman's "admission" is "evidence . . . of such a nature that it would probably produce an acquittal or yield a less severe sentence on retrial." In order to constitute newly discovered evidence, the evidence must be admissible at a retrial. *Williamson v. State*, 961 So. 2d 229, 234 (Fla. 2007). The trial court correctly concluded that Heyman's "statements are not relevant to Defendant's guilt or innocence and would not be admissible at a new trial." Evidence is relevant if it tends to prove or disprove a material fact. § 90.401, Fla. Stat. (2020). That Heyman authored the notes does not tend to prove or disprove a fact material to whether Dailey committed first-degree murder. Thus, Heyman's "admission" would not be admissible at a retrial. And even assuming the "admission" were admissible at a retrial, it would not weaken the case against Dailey so as to give rise to a reasonable doubt as to his culpability.

## B. Pearcy's 2019 Declaration

Next, Dailey argues that the trial court erred in denying his newly discovered evidence claim based on a declaration executed by Pearcy in December 2019, which states, "James Dailey had nothing to do with the murder of Shelly Boggio. I committed the crime alone. James Dailey was back at the house when I drove Shelly Boggio to the place where I ultimately killed her." Prior to the evidentiary hearing on this claim, Dailey took Pearcy's deposition in February 2020. At the end of the deposition, Pearcy announced that he had nothing more to say and did not want to be brought back to court to testify in Dailey's case. At the evidentiary hearing in March 2020, Pearcy refused to testify despite numerous attempts by the judge and his family to persuade him to do so, and the trial court refused to admit the February 2020 deposition as substantive evidence.

In denying this claim after the evidentiary hearing, the trial court concluded that there is no new, admissible evidence that Pearcy confessed to committing the murder by himself even if the deposition had been admitted, because during the deposition Pearcy repeatedly denied the truthfulness of the statement in the

declaration that he was responsible for the murder. The trial court also noted that in 2019, this Court held that a prior affidavit in which Pearcy claimed sole responsibility for Boggio's murder was inadmissible hearsay and inadmissible as a third-party admission of guilt under *Chambers v. Mississippi*, 410 U.S. 284 (1973). *See Dailey*, 279 So. 3d at 1213-14.

The trial court did not err in denying this claim. In the prior Pearcy affidavit referred to by the trial court, Pearcy affirmed in 2017, "James Dailey was not present when Shelly Boggio was killed. I alone am responsible for Shelly Boggio's death." *Id.* at 1213. But Pearcy also refused to testify about any substantive assertion in the affidavit at the evidentiary hearing on that claim. After admitting that he signed the affidavit, he testified that its contents were not true. *Id.* When asked to identify the untruthful statements, he responded, "I'm not sure. There's quite a few lines on there." *Id.* During a proffer, Pearcy stated that paragraphs one and two of the affidavit—which listed his name and status as an inmate and recognized that he had been convicted of murder and sentenced to life imprisonment—were true. *Id.* When questioned about the truthfulness of each remaining paragraph, Pearcy

- 14 -

invoked the Fifth Amendment and refused to answer, even after the court compelled him to do so. *Id.*

Following the hearing on the 2017 claim, the postconviction court concluded that the affidavit was inadmissible hearsay and inadmissible as a third-party admission under *Chambers*, and that because Dailey had failed to provide any admissible evidence, his claim failed the first prong of the *Jones* standard for newly discovered evidence. On appeal, we "agree[d] with the circuit court's determination 'that Pearcy's affidavit is hearsay of an exceptionally unreliable nature and does not qualify as a statement against interest' " and also that it did not "qualify as a third-party admission of guilt under *Chambers*." *Id.*

As with the 2017 claim, the trial court here properly denied relief because Dailey failed to introduce any admissible evidence to support his claim that there is newly discovered evidence that Pearcy alone committed the murder. Dailey claims that the trial court erred in ruling that Pearcy's 2020 deposition was inadmissible as substantive evidence and makes a number of arguments in support of this claim. But even if we were to assume, without deciding, that the trial court did err in refusing to admit the

- 15 -

deposition, we would still conclude that Dailey is not entitled to relief.

During the deposition, Pearcy repeatedly denied that he was solely responsible for the murder, contrary to what he had stated in his December 2019 declaration. Pearcy repeatedly explained that he lied in the 2019 declaration in order to keep Dailey from being executed and to keep Dailey's attorneys working on the case. Pearcy said he did this because his own appeals were exhausted and he had no advocacy for himself, so he hoped that Dailey's attorneys would keep working on Dailey's case and possibly discover new evidence that would ultimately help Pearcy's case. Thus, the deposition completely invalidates the claim that Dailey sought to support by its admission—i.e., that "[t]he December 18, 2019 declaration of Jack Pearcy proves Mr. Dailey is innocent and that Jack Pearcy alone murdered Shelly Boggio."

### C. "Timeline" Evidence from Pearcy's 2020 Deposition

Next, Dailey argues that the trial court erred in denying his claim that testimony Pearcy provided at his 2020 deposition that he and the victim went out drinking by themselves immediately after dropping Shaw at a phone booth constitutes newly discovered

- 16 -

evidence that establishes that Dailey could not have been present at the time and place of the victim's death when viewed in light of other admissible evidence. The trial court summarily denied this claim as untimely; we agree.

"To be considered timely filed as newly discovered evidence, [a] successive rule 3.851 motion [i]s required to [be] filed within one year of the date upon which the claim bec[omes] discoverable through due diligence." *Rodgers v. State*, 288 So. 3d 1038, 1039 (Fla. 2019) (quoting *Jimenez v. State*, 997 So. 2d 1056, 1064 (Fla. 2008)). In his fifth successive motion, filed in July 2020, Dailey framed this claim: "During Pearcy's February 2020 Deposition, Pearcy admitted, for the first time, that he went out drinking alone with Shelly Boggio on the night she was murdered immediately after dropping his friend, Oza Shaw, at a phone booth." In a footnote to the very next sentence of his motion, Dailey wrote, "Pearcy originally referenced a solo outing with Boggio in a statement to police on June 19, 1985. *See* Pearcy June 1985 Statement, R2 8511-12." Indeed, Pearcy stated, under oath, in 1985, "And then, like I said, just [Shelly Boggio] and I left. [Dailey] stayed there and Oza [Shaw] and Gail. And [Boggio and I] went down to TI Island

- 17 -

and went in some bar called Hank's and had a beer or whatever or a drink." And in 1993, Pearcy testified, "I had left with Shelly, and [Dailey], I don't know where he was. He could have been in his bedroom or wherever. And when Shelly and I left, Oza asked me to drop him off to make a phone call to his ex-wife, Rose, in Kansas and the three of us left and I dropped Oza off a couple blocks from the house at a quick trip type store."

Summary denial of this claim was proper because the alleged new information has been known to Dailey since 1985 or 1993. To the extent that Dailey claims this evidence is "new" because Pearcy admitted going alone with the victim to Hank's in his 1985 statement, but he claimed that this trip took place before midnight and made no mention of taking Shaw to the pay phone, and in his 1993 statement, he acknowledged dropping Shaw at the pay phone and thereafter being alone with the victim for an hour to an hour and a half but made no mention of a visit to Hank's, Dailey does not explain why Pearcy could not have been asked, through the exercise of due diligence, at least after the 1993 statement, whether he and the victim visited Hank's alone after taking Shaw to the pay phone. Nor does he explain why it could not have been inferred in 1993

from the 1985 and 1993 statements that the visit to Hank's occurred after Shaw was dropped off at the pay phone. Thus, even if this evidence could be considered new to Dailey, he has not demonstrated that he could not have discovered it in 1993 through the exercise of due diligence.

## D. Motion to Perpetuate

Dailey next claims that the trial court erred in dismissing his motion to perpetuate Pearcy's testimony, which was filed in conjunction with his fifth successive motion. The trial court dismissed the motion as moot due to fact that the purpose of the deposition would have been to prepare for an evidentiary hearing on Dailey's fifth successive motion, which it had dismissed. "The decision whether to grant a motion to perpetuate testimony lies within the discretion of the trial court." *Riechmann v. State*, 966 So. 2d 298, 310 (Fla. 2007) (quoting *Cherry v. State*, 781 So. 2d 1040, 1054 (Fla. 2000)). In light of the dismissal of Dailey's fifth successive motion, which we uphold today, we find no abuse of discretion in the dismissal of Dailey's motion to perpetuate as moot.

## E.  Cumulative Error

Finally, Dailey claims that the trial court erred in failing to conduct a cumulative error analysis.  Dailey contends that he was entitled to a cumulative analysis based on his claim that there is newly discovered evidence that Pearcy confessed to committing the murder by himself, ASA Heyman's 2020 "admission," and Pearcy's 2020 deposition.

The trial court was correct that any alleged newly discovered evidence must be admissible not only to satisfy the newly discovered evidence standard and constitute newly discovered evidence under the law but also to warrant a cumulative review of the evidence.  As discussed above, the trial court correctly concluded that any "new" claims that Pearcy committed the murder alone based on his 2019 declaration and 2020 deposition are inadmissible and therefore do not constitute newly discovered evidence or warrant a cumulative analysis.  The same is true for Heyman's "admission," which would also be inadmissible at a retrial, as explained above.  Because each of Dailey's claims failed, he was not entitled to a cumulative review of the evidence.

As this Court stated in Dailey's previous postconviction appeals,

> Dailey next argues that the circuit court erred in failing to conduct a cumulative analysis. Generally, in determining whether newly discovered evidence would likely produce an acquittal upon retrial, a court must evaluate "the effect of the newly discovered evidence, in addition to all of the admissible evidence that could be introduced at a new trial." *Hildwin v. State*, 141 So. 3d 1178, 1184 (Fla. 2014). But given that all of Dailey's newly discovered evidence claims were either correctly rejected as untimely or based on inadmissible evidence, no such analysis was necessary. Thus, Dailey is not entitled to relief on this claim.

*Dailey*, 279 So. 3d at 1216 (Fla. 2019); *see also Dailey*, 283 So. 3d at 791. Thus, the trial court did not err here in declining to conduct a cumulative analysis.

## III. CONCLUSION

For the reasons above, we affirm the trial court's orders denying in part and dismissing in part Dailey's fourth successive motion for postconviction relief, dismissing his fifth successive motion for postconviction relief, and dismissing his motion to perpetuate testimony.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.

LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

In this case, there was *no* forensic evidence linking Dailey to Boggio's murder, and a significant component of the State's case was the testimony of three inmates who were housed in the same jail as Dailey while he awaited trial. These inmates testified that Dailey admitted to Boggio's murder, and given the lack of forensic evidence, this testimony was likely essential to the jury's finding of guilt.

In her concurring opinion in *Lightbourne v. State*, 841 So. 2d 431, 443 (Fla. 2003), Justice Pariente discussed the well-known concerns surrounding the reliability of inmate testimony. "Overall, because of the substantial risk of recantation, the State's reliance on jailhouse informants to obtain convictions has the potential for impacting both the finality of convictions and the integrity of the judicial process." *Id.* at 443. While *Lightbourne* involved an inmate's recantation of trial testimony, the underlying concern is

- 22 -

the same in Dailey's case. Inmates are commonly "willing to stretch the truth in their own self-interest at the time of trial." *Id.*

Issues surrounding the trustworthiness of inmate testimony are not novel or uncommon, nor are they unique to Florida:

> Indeed, due to the suspect nature of jailhouse testimony and the question mark such testimony has left on the reliability of Illinois' death convictions, the State of Illinois Governor's Commission on Capital Punishment has recommended that its police, prosecutors, capital case defense attorneys, and judges receive periodic training on the risk of false testimony by in-custody informants. *See* State of Illinois, Report of the Governor's Commission of Capital Punishment, at 21, 27, 28 (2002).

*Lightbourne*, 841 So. 2d at 443 n.10.

Although Justice Pariente (joined by Justice Shaw) concurred specially with the majority opinion in *Lightbourne* affirming the circuit court's denial of postconviction relief, she did so while noting that "[i]n this case, there was substantial independent evidence to support the finding of guilt and the imposition of the death sentence without the testimony of the informants." *Id.* at 443. For example, evidence at trial revealed that pubic hair matching Lightbourne's and semen consistent with his blood type were found on the victim's body, and that he was found in possession of a necklace belonging to the victim. *Id.* at 442. No such evidence was

- 23 -

presented in this case. In my view, the present case lacks such "substantial independent evidence." *Id.* at 443. Rather, Dailey's conviction and sentence of death exist under a cloud of unreliable inmate testimony.

The confidence in Dailey's conviction and sentence is further compromised by the conflicting statements of codefendant Jack Pearcy, who although he later denied it, admitted in 2019 to being solely responsible for Boggio's murder. Pearcy, who was tried first, convicted of first-degree murder, and sentenced to life imprisonment, executed a declaration where he stated, "James Dailey had nothing to do with the murder of Shelly Boggio. I committed the crime alone. James Dailey was back at the house when I drove Shelly Boggio to the place where I ultimately killed her." Majority op. at 13. Although Pearcy later refused to repeat his confession during his deposition and during the evidentiary hearing on Dailey's claims, his admission to being solely responsible for Boggio's murder, coupled with the lack of substantial independent evidence to corroborate the testimony of the jailhouse informants, sufficiently compromises Dailey's conviction and the application of the death sentence.

Ironically, Pearcy, who was convicted by a jury of the murder of Shelly Boggio and who thereafter confessed to the murder and stated that Dailey was not involved, received a life sentence, while Dailey, convicted in no small part due to the testimony of three inmates and without substantial independent evidence, is facing the death penalty.

While finality in judicial proceedings is important to the function of the judicial branch, that interest can never overwhelm the imperative that the death penalty not be wrongly imposed. Since Florida reinstated the death penalty in 1972, thirty people have been exonerated from death row. *Death Penalty Information Center*, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/florida (last visited Aug. 2, 2021). Thirty people would have eventually been put to death for murders they did not commit. This number of exonerations, the highest in the nation, affirms why it is so important to get this case right.

I respectfully dissent.

An Appeal from the Circuit Court in and for Pinellas County,
   Pat Edward Siracusa, Jr., Judge
   Case No. 521985CF007084XXXXNO

Eric Pinkard, Capital Collateral Regional Counsel, Julissa Fontán and Natalia C. Reyna-Pimiento, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida; Laura Fernandez, New Haven, Connecticut; Cyd Oppenheimer, New Haven, Connecticut; Seth Miller of Innocence Project of Florida, Inc., Tallahassee, Florida; Scott A. Edelman and Stephen P. Morgan of Milbank, LLP, New York, New York; and Joshua Evan Dubin of Dubin Research & Consulting, Miami, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, Christina Z. Pacheco, Timothy A. Freeland, and Stephen D. Ake, Assistant Attorneys General, Tampa, Florida,

for Appellee