742 So.2d 238 (1999)
Ian Deco LIGHTBOURNE, Appellant,
v.
STATE of Florida, Appellee.
No. 89,526.
Supreme Court of Florida.
July 8, 1999.
*239 Martin J. McClain, Litigation Director, Office of the Capital Collateral Regional CounselSouthern Region, Miami, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Mark S. Dunn, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have on appeal the trial court's order denying Ian Deco Lightbourne's petition for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we reverse for the trial court to consider, when evaluating Lightbourne's claims, the cumulative effect of the evidence that has been presented in this and prior postconviction proceedings. This evidence calls into question the veracity of the testimony of two jailhouse informants, Theodore Chavers and Theophilus Carson *240 (a/k/a James Gallman), who testified during the guilt phase of Lightbourne's trial to extremely incriminating statements made to them by Lightbourne. Although we conclude that the verdict as to guilt would have been the same even without the informant's testimony, we cannot conclude, based on the record at this time, that there is no probability or reasonable possibility of a different result as to the imposition of the death penalty.

I. BACKGROUND
A review of the background of this case is necessary to place Lightbourne's current claims in proper perspective. Lightbourne, a twenty-one-year-old Bahamian immigrant at the time of the crime, is on death row for the 1981 murder of Nancy O'Farrell, the daughter of a thoroughbred horse breeder in Ocala. Lightbourne was found guilty of first-degree murder on the alternate theories of premeditation, felony murder in the commission of a burglary, and felony murder in the commission of a sexual battery.[1] During the penalty phase, the State put on no additional testimony but relied on the evidence presented during the guilt phase, including the testimony of Chavers and Carson, who testified that Lightbourne admitted raping, murdering and shooting O'Farrell because she could identify him. Their testimony is set out in the Eleventh Circuit's 1987 decision denying habeas relief:
Theodore Chavers, a cellmate in the Marion County Jail, testified that [Lightbourne] "knew too much"[2] about the details of Nancy's death and made some incriminating statements during the course of their conversations. According to Chavers, petitioner made references indicating that he entered Nancy's house, encountered her as she was coming out of the shower, forced her to engage in sexual intercourse, and shot her[3] despite pleas for mercy. This version of the facts was corroborated by Theophilus Carson, another cellmate in the Marion County Jail. According to Carson, petitioner admitted forcing Nancy to have sex, shooting her because she could identify him, and taking a necklace and some money.
Lightbourne v. Dugger, 829 F.2d 1012, 1016 (11th Cir.1987). Chavers' testimony related graphic details of what Lightbourne allegedly told him about the sexual assault and murder: that Lightbourne told him he had forced O'Farrell to perform sex acts before murdering her, including forcing her to perform oral sex "over and over," and that she "was begging him not to kill her." Carson testified that Lightbourne told him that police "had him" for "shooting a bitch," meaning O'Farrell, and that he shot her because "she could identify him."
In mitigation, the defense called only Lightbourne, who testified that he was twenty-one years old, a Bahamian citizen, *241 and a father of three who had never been convicted of a crime as an adult. No other mitigating evidence was presented to the jury.
Following the jury's recommendation, the trial court imposed a sentence of death. In the sentencing order, the trial court found that the murder was committed under the following aggravating circumstances: (1) during the commission of a burglary and sexual battery; (2) for the purpose of avoiding arrest (avoid arrest); (3) for pecuniary gain; (4) that the murder was heinous, atrocious or cruel (HAC); and (5) was committed in a cold, calculated and premeditated manner (CCP).
The trial court's order imposing the death penalty did not specify the precise evidence it relied on in finding that the aggravators had been established. However, during closing arguments, in support for the avoid arrest aggravator, the prosecutor referred to Carson's testimony that Lightbourne told him he killed O'Farrell because she could identify him as support for the avoid arrest aggravator. In affirming the death sentence on appeal, we specifically referred to testimony adduced from Chavers and Carson regarding the aggravators of HAC and commission during a sexual battery and burglary. See Lightbourne v. State, 438 So.2d 380, 390-91 (Fla.1983).
It would appear that the testimony of Chavers and Carson supports at least three of the aggravators found by the trial courtHAC, CCP and committed to avoid arrest. While there may have been other evidence to support them, these aggravators find strong support in the jailhouse informants' testimony.
The trial court found only two mitigators: (1) no significant history of criminal activity and (2) Lightbourne's relative youth at the time of the crime. It found that Lightbourne failed to establish "by evidence any other mitigating circumstances." However, the trial court's order imposing the death penalty stated that it had considered a presentence investigation report revealing that Lightbourne was illegitimate, raised in a lower socioeconomic class, and had little or no relationship with his father, who separated from the family when Lightbourne was a young boy. However, the sentencing order did not specifically mention those circumstances.
This Court affirmed the summary denial of Lightbourne's first rule 3.850 motion without an evidentiary hearing. See Lightbourne v. State, 471 So.2d 27 (Fla. 1985).[4] This first rule 3.850 motion was based primarily on ineffective assistance of trial counsel.
The majority concluded that trial counsel was not ineffective for failing to present mitigating evidence at sentencing because "the sentencing judge was in fact aware of many of the many mitigating factors that counsel on appeal is now presenting to the Court," including Lightbourne's low socioeconomic home environment, educational history and religious background. Id. at 28. Of significance to the issue before us concerning the alleged lack of due diligence in discovering the testimony of other jailhouse witnesses, the majority also concluded that Lightbourne's counsel was not ineffective for "fail[ing] to impeach or rebut the trial testimony of certain jailhouse informants." Id. at 28.
From the time of his first appeal, Lightbourne has attacked the testimony of the jailhouse informants. On direct appeal from his conviction, Lightbourne alleged that Chavers' testimony should have been suppressed because it was solicited in violation of United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), which prohibits the use of statements deliberately elicited by a government agent from the defendant in violation of the Sixth Amendment right to counsel. Lightbourne maintained that Chavers was working as an agent for the state when he questioned Lightbourne about the murder *242 while both were in prison. See Lightbourne, 438 So.2d at 386.
This Court rejected that claim, based in part on Chavers' testimony that he had no prearranged guarantee of money or favors in return for information and our conclusion that the record revealed no "overt scheme" to elicit statements from Lightbourne in which the State took part:
In the instant case there is nothing in the record establishing that the informant Chavers had any prearranged guarantee of money in return for information, and it appears that the two hundred dollars that he did receive from the Marion County Sheriffs Department was drawn from a general reward fund and not given as an inducement to elicit information.
Similarly, Investigator LaTorre's advice to the informant Chavers to keep his ears open does not constitute an attempt by the state to deliberately elicit incriminating statements. Without some promise or guarantee of compensation, some overt scheme in which the state took part, or some other evidence of prearrangement aimed at discovering incriminating information we are unwilling to elevate the state's actions in this case to an agency relationship with the informant Chavers.
Lightbourne, 438 So.2d at 386. Justice Overton dissented, concluding that the facts set forth by the majority established a Henry violation. See id. at 392.
When Lightbourne raised the same Henry claim in his habeas petition before the Eleventh Circuit, a divided panel denied relief. See Lightbourne, 829 F.2d at 1019-21. The majority concluded that to the extent that a Sixth Amendment violation might have occurred, because "witness Carson covered the same sort of statements including Lightbourne forcing Nancy to engage in multiple sexual acts prior to her murder," any error in admitting Chavers' testimony was harmless.[5]Id. at 1021 n. 9. One Eleventh Circuit judge dissented, providing a detailed analysis of how, in his opinion, the testimony of Chavers and the lead investigator established a Henry violation. See id. at 1028-35 (Anderson, J., dissenting).[6]
Lightbourne's second 3.850 motion focused primarily on attacking the reliability of the jailhouse informants, including affidavits and other exculpatory information concerning Chavers and Carson. See Lightbourne v. Dugger, 549 So.2d 1364, 1367 (Fla.1989). Lightbourne alleged entitlement to a new trial based on this newly-discovered evidence and Brady[7] violations based on the State's failure to disclose that police had engaged in a scheme with Chavers and Carson to elicit incriminating statements from Lightbourne. See Lightbourne, 549 So.2d at 1367.
In support of the second 3.850 motion, Chavers alleged in his affidavit that he was "made" to testify against Lightbourne at his trial, that police made it clear that it would be in his best interest to find out all he could from Lightbourne, that police dropped charges against him for his cooperation, that Lightbourne never told Chavers or Carson that he had murdered O'Farrell, and that what really happened in his conversations with Lightbourne was "very different" than the way he was "made" to testify at trial.
Chavers' affidavit also alleged that Carson had been persuaded to lie in his testimony regarding Lightbourne by authorities "dropping his charges." In addition, Lightbourne submitted the affidavit of Jack Hall alleging that he was in the cell *243 with Lightbourne, that he was the only person Lightbourne would talk to, and that he heard Chavers and others discussing how they would get out of jail by telling the police Lightbourne had made incriminating statements. The trial court summarily denied the second 3.850 motion.
This Court concluded that an evidentiary hearing on these allegations in the petition was required. See Lightbourne, 549 So.2d at 1367. However, we affirmed the trial court's summary denial of Lightbourne's claims regarding the original trial judge's impartiality. See id. at 1366.[8]
On remand, the trial court conducted an evidentiary hearing and concluded that Chavers, Hall and Carson were all unavailable witnesses. As we explained in affirming the trial court's decision on this issue:
Hall had died and Carson could not be located despite a diligent search. At the hearing, Chavers appeared to testify but demonstrated great difficulty in answering questions. After a medical and psychological evaluation, he was found incompetent to testify. His testimony was deferred, and when he testified three months later, he professed to have a lack of memory and refused to answer questions. Chavers was found in contempt of court and declared unavailable as a witness.
Lightbourne v. State, 644 So.2d 54, 56 (Fla. 1994) (emphasis supplied). The trial court did not admit Chavers' affidavit in place of his testimony or conversations and letters from Chavers to the assistant state attorney who prosecuted Lightbourne's case. In addition, the trial court did not admit a letter written by Ray Taylor who claimed that Chavers told him he lied at Lightbourne's trial. The trial court further did not admit Jack Hall's affidavit into evidence.
Lightbourne did, however, present the testimony of Richard Carnegia, who was incarcerated with Lightbourne and Chavers. He testified that Chavers approached him and told him he should say Lightbourne confessed if he wanted to get out of jail. This testimony corroborated Chavers' affidavit. See Lightbourne, 644 So.2d at 57 n. 4.
This Court affirmed the trial court's rulings regarding the inadmissible hearsay. The Court found that the although Chavers and Hall were unavailable, Chavers' affidavit was not against interest at the time it was made, after the expiration of the statute of limitations for perjury. See id. at 57. Further, the timing of the affidavit, several years after the murder, combined with Chavers' alleged memory loss and refusal to answer questions, as well as the contradiction in some of the letters sought to be introduced, all undermined the reliability of the letters and affidavit. See id. The Court agreed with the trial court that Hall's affidavit was inadmissible because it was not against interest when made and concluded that Taylor's letter similarly did not fall within any recognized hearsay exception. See id. Finally, the Court distinguished Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), concluding that Camegia's testimony was not sufficiently corroborating to establish the reliability of Chavers' affidavit so as to allow its admission. See Lightbourne, 644 So.2d at 57.[9]

*244 II. THE MOST RECENT PROCEEDINGS
In 1994, Lightbourne filed his most recent rule 3.850 motion based upon the affidavits of Carson and Larry Emanuel, also incarcerated with Lightbourne prior to his trial, alleging that these affidavits established Brady, Henry and Giglio[10] violations or, in the alternative, constituted newly discovered evidence that would probably produce a different result on retrial. In his affidavit, Carson claimed that he had testified falsely in Lightbourne's trial under pressure from the State. This statement was consistent with Chavers' previous affidavit.
To corroborate Carson's claims, Lightbourne also included an affidavit by Emanuel, who had not testified at Lightbourne's trial, but who had been incarcerated with Lightbourne at the same time as Carson and Chavers. Emanuel swore in his affidavit that he had been solicited by police to testify against Lightbourne and that "the other guys in the cell" were also promised leniency on their charges for testimony against Lightbourne. Emanuel stated in his affidavit that "one of those guys was Uncle Nut Chavers," referring to Chavers.
After finding Emanuel's testimony procedurally barred, the trial court held an evidentiary hearing on Carson's testimony. The State did not argue that Carson's testimony was procedurally barred. In fact, this Court had explicitly found in its prior opinion in its 1994 opinion that "Carson could not be located despite a diligent search." Lightbourne, 644 So.2d at 56. At the hearing, Carson testified under oath that "several" individuals from the police or sheriff's department solicited his help in the Lightbourne case, fed him information that he was to try to get Lightbourne to admit, and then threatened and coerced him into lying against Lightbourne at trial.
Carson testified that, in fact, Lightbourne had not admitted any involvement in the crime whatsoever and that he was motivated to testify falsely against Lightbourne because he was under charges for accessory to grand theft at the time and that the State had him in a "do or die" situation. Carson claimed that the officers told him that they would ensure that his sentence on the charge was "max[ed] out" if he did not cooperate, and if he did, he would receive a "time served" sentence. Carson claimed that his charges were "dropped" after he testified in the Lightbourne case and that the officers also agreed to help him on charges he was facing in Hillsborough County.
Attempting to refute Carson's testimony, the investigators in the case, as well as the assistant state attorney prosecuting the case and Carson's defense attorney on the accessory to grand theft charges[11] all testified that, to their knowledge and recollection, there was no "deal" with the State in exchange for Carson's testimony.[12] Further, the trial court considered evidence from Carson's grand theft case that showed that Carson's case was settled before Lightbourne's trial and that the plea agreement itself contained no requirement that Carson testify in return for a time-served *245 sentence, which was a little over three months of the one-year maximum sentence on the charge to which he pled guilty. However, the assistant state attorney did testify that after the case was over it was brought to his attention (presumably by Carson's letter) that Carson had charges pending in Hillsborough County, and he made a call to Hillsborough County on Carson's behalf.
The trial court concluded that Carson's recanted testimony was not believable, based in large part on the testimony that there had been no deal. The trial court also concluded that Emanuel's testimony was procedurally barred because it could have been presented earlier and thus did not allow Emanuel to testify, nor did the court consider his affidavit.
On appeal, Lightbourne alleges five errors: (1) the trial court denied Lightbourne a full and fair evidentiary hearing by refusing to consider the substance of Emanuel's testimony; (2) the State withheld exculpatory evidence and presented false testimony in violation of Lightbourne's constitutional rights; (3) newly discovered evidence establishes that Lightbourne is entitled to a new sentencing proceeding; (4) the trial court applied the wrong standard in reviewing Lightbourne's claims and failed to consider the cumulative effect of all the evidence discovered since Lightbourne's trial; and (5) Lightbourne's due process and equal protection rights were violated by the participation of an assistant state attorney who may have been a material witness. We reverse for a new evidentiary hearing because we conclude that Emanuel's testimony should have been considered and that the trial court should have conducted a cumulative analysis of the evidence presented in the postconviction proceedings in evaluating Lightbourne's claims.

III. ANALYSIS
First, Lightbourne claims that the trial court erred in finding that Emanuel's testimony was procedurally barred and refusing to give Emanuel an opportunity to testify. We agree that Emanuel's testimony is not procedurally barred.
The trial court concluded that Emanuel's testimony was barred not only because Emanuel was discoverable since 1990 through the exercise of due diligence, but also as early as 1981, at the time of Lightbourne's trial, when it was known that Emanuel had been incarcerated with Lightbourne, Chavers and Carson. Thus, the trial court reasoned that Emanuel's testimony could have been discovered then.
We find that it would be inconsistent for us to conclude that Emanuel is procedurally barred from testifying because he was available in 1981 in light of the fact that Richard Carnegia, another inmate incarcerated with Lightbourne in 1981, was permitted to testify in the 1990 proceedings. The law of this case is that these two individuals had newly discovered evidence in 1990 and only one could be located. Emanuel should not be prevented from testifying because he could have been located in 1981.
This brings us to the question of CCR's due diligence since 1989, when Chavers submitted the affidavit recanting his trial testimony. During the 1990 hearings on Lightbourne's motion for postconviction relief, occasioned by Chavers' recanted testimony, Lightbourne's counsel informed the trial court that they had been diligently seeking Emanuel, but had been unable to find him. The trial court did not find it necessary to hear the testimony of CCR investigators to establish their diligence in looking for Emanuel because it was clear CCR was looking for Carson, Emanuel and Carnegia, but had successfully located only Carnegia.[13]
*246 During the hearing on the most recent 3.850 proceedings, both Martin McClain[14] and Thomas Dunn, former CCR attorneys who represented Lightbourne in his prior postconviction proceedings, also testified that they and their staff had been diligently searching for Emanuel since 1989, with no success. Lightbourne's attorney represented to the trial court in the proceedings below that CCR had finally found Emmanuel because a family member had disclosed his whereabouts.
The State maintains that contrary to the CCR attorneys' testimony, Emanuel could have been located since 1990, when he was incarcerated in Texas, if only CCR had requested an NCIC (National Crime Information Center) report on Emanuel. According to the testimony of one of the State's investigators who began compiling the information weeks before the evidentiary hearing in 1995, Emanuel was either in jail or on parole in Texas from 1990 until he was located by CCR in 1994. The investigator provided hearsay testimony that she had spoken with an individual at FDLE, (Florida Department of Law Enforcement), who informed her that CCR first requested a criminal history on Emanuel in 1994. The crux of the State's argument was that if CCR had been exercising due diligence, they could have earlier requested that FDLE provide an NCIC report, which would have revealed Emanuel's whereabouts.
The record is inconclusive regarding the availability and use of NCIC reports by CCR. CCR attorneys have testified in the hearings at issue in this appeal, as they did in the 1990 hearings, that they have in the past obtained NCIC reports. However, Martin McClain testified that even though CCR has obtained NCIC reports in the past, he did not believe that CCR was entitled to them because CCR is not a government agency. In fact, the State has argued in at least one other case on appeal, Thompson v. State, 731 So.2d 1235, 24 Fla. L. Weekly S17 (Fla.1998), that NCIC records are not available via a public records request. Further, CCR has provided this Court with a copy of a circuit court order in another case finding that NCIC reports are not public records. See State v. Floyd, Nos. CRC 84-00578CFNO; CRC 84-00589CFANO (Fla. 6th Cir. Ct. Sept. 8, 1998). CCR maintains that they finally discovered Emanuel's whereabouts from a family member who had theretofore been reticent about providing that information.
In this case there is considerable evidence that CCR had been actively looking for Emanuel. According to the representations made to the court in the 1990 hearings, CCR was exercising due diligence since 1989 to find Lightbourne's cellmates from 1981. CCR had been successful in locating Carnegia by 1990, and both Carson and Emanuel were found by 1994. The State does not argue that Carson should have been found earlier and we find that the same applies to Emanuel. Therefore, we conclude that Emanuel's testimony should not be procedurally barred, and we remand for the trial court to hear his testimony.
Lightbourne further argues that the trial court also erred in failing to conduct a cumulative analysis of the evidence discovered since trial when ruling on *247 whether Carson's recanted testimony requires a new trial. Lightbourne argues that Carson's recanted testimony, as well as the other evidence discovered in this case since trial, establishes that the State committed a Brady violation in withholding evidence that Chavers' and Carson's testimony was false and elicited in violation of Henry, which, if true, would have rendered their testimony inadmissible at trial. Further, Lightbourne argues that even if the evidence does not establish a Brady violation, it qualifies as newly discovered evidence that should be considered collectively to determine whether a new trial or resentencing is required.
The trial court rejected the Brady claim, concluding that because Carson's testimony was "not believable," Lightbourne had not shown that the State had solicited his testimony in violation of Henry, failed to disclose an assistance agreement with the witnesses in violation of Giglio, and withheld material exculpatory evidence regarding these matters in violation of Brady. A Henry violation is established when police improperly use a jailhouse informant to elicit statements from a defendant in violation of his Sixth Amendment right to counsel, see 447 U.S. at 274, 100 S.Ct. 2183, and Giglio is violated when the state knowingly presents false testimony. See 405 U.S. at 154-55, 92 S.Ct. 763.[15] Because Lightbourne's Brady claim is based on the alleged violations of Henry and Giglio, unless Carson's recanted testimony that the police solicited and used his false testimony is credible, Lightbourne's Brady claim cannot be established.
However, even if Carson's testimony does not establish a Brady violation, it nonetheless may qualify as newly discovered evidence that the trial court should evaluate, in light of the other evidence adduced since trial, to determine whether it would probably produce a different result. See State v. Spaziano, 692 So.2d 174, 176 (Fla.1997); Armstrong v. State, 642 So.2d 730, 735 (Fla.1994). In Armstrong, we explained that recanted testimony can be considered newly discovered evidence, but in making that determination, the trial court must examine "all the circumstances of the case." 642 So.2d at 735 (emphasis supplied). We cautioned, however, that recanted testimony is "exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true." Id. Only where the recanted testimony is of such nature that a different verdict would probably be rendered should a new trial be granted. See id.
In this case the trial court concluded that Carson's recanted testimony would not probably produce a different result on retrial. In making this determination, the trial court did not consider Emanuel's testimony, which it had concluded was procedurally barred, and did not consider Carnegia's testimony from a prior proceeding. The trial court cannot consider each piece of evidence in a vacuum, but must look at the total picture of all the evidence when making its decision.
When rendering the order on review, the trial court did not have the benefit of our recent decision in Jones v. State, 709 So.2d 512, 521-22 (Fla.), cert. denied, 523 U.S. 1040, 118 S.Ct. 1350, 140 L.Ed.2d 499 (1998), where we explained that when a prior evidentiary hearing has been conducted, "the trial court is required to `consider all newly discovered evidence which would be admissible' at trial and then evaluate the `weight of both the newly discovered evidence and the evidence which was introduced at the trial'" in determining whether the evidence would probably produce a different result on retrial. This cumulative analysis must be conducted so that the trial court has a "total picture" of the case. Such an analysis is similar to the cumulative analysis that must be conducted *248 when considering the materiality prong of a Brady claim. See Kyles v. Whitley, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("The fourth and final aspect of ... materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item."); see also State v. Parker, 721 So.2d 1147, 1151 (Fla.1998) (conducting a cumulative analysis to evaluate a Brady claim).
The cumulative effect of the evidence relates to the veracity of the trial testimony of Carson and Chavers. When considering Lightbourne's Henry claim in our original opinion, this Court stated that without "some other evidence of prearrangement aimed at discovering incriminating information," we were "unwilling to elevate the state's actions in this case to an agency relationship with the informant Chavers." Lightbourne, 438 So.2d at 386. All of Lightbourne's cellmates from 1981 who have now been located, either by hearing testimony, deposition, or affidavit, corroborate Lightbourne's claims that agents of the state may have actively solicited testimony against Lightbourne. Even if there was no active solicitation, all of the evidence may corroborate the claim that Carson and Chavers' testimony at the original trial may have been false and that their testimony was motivated by a belief that testimony favorable to the state would help them on their pending charges.
Carson has now testified that the police solicited him to testify against Lightbourne. In his proffered deposition, Emanuel claimed that he was solicited to testify against Lightbourne. According to Emanuel, he falsely reported to police that Lightbourne confessed his involvement in the crime, when in fact Lightbourne denied murdering the victim. Emanuel claimed that the charges against him were dropped after he provided police with this information. Emanuel did not testify at Lightbourne's trial.
Richard Carnegia, who testified at the 1990 evidentiary hearings, also corroborates Carson and Emanuel's testimony. He claimed that while he was imprisoned with Lightbourne, Chavers, Carson, and Emanuel, Chavers approached him and encouraged him to tell police Lightbourne had committed the crime if he wanted to get out of jail. He further testified that police removed him from the cell and questioned him regarding whether he had heard Lightbourne make any incriminating statements about the murder. This testimony corroborates Carson's claims that police solicited his testimony, and rebuts Chavers' testimony at the original trial that he did not have a prearranged deal with police. The trial court should consider the total picture when evaluating Carson's credibility.
However, even assuming the credibility of all of the post-trial evidence and that a Brady claim has been established, and even assuming that Chavers' and Carson's trial testimony had been excluded under Henry or that Chavers and Carson had not even testified, we do not find that there is a "reasonable probability" of a different result in the guilt phase under Lightbourne's Brady claim, Kyles, 514 U.S. at 434, 115 S.Ct. 1555, nor, if considered as newly discovered evidence, would the evidence "probably produce an acquittal on retrial." Jones, 709 So.2d at 521. Even without Chavers' and Carson's testimony, the evidence overwhelmingly supports a conviction of guilt.
Pubic hair matching Lightbourne's, and semen consistent with his blood type, were found on the victim's body. Lightbourne, who had been an employee of the victim's father, was seen with a unique .25 caliber pistol just a few days before the crime, and was arrested a week after the murder with the weapon still in his possession. Lightbourne admitted he owned the gun. A bullet casing found in Lightbourne's automobile matched a bullet casing found at the scene of the crime, and in the opinion of the expert witness, the bullet that killed Ms. O'Farrell was fired from that weapon. Lightbourne was also found in possession *249 of a unique necklace later identified as belonging to O'Farrell. Lightbourne claimed the necklace was his.
We cannot reach the same firm conclusions as to the penalty phase. We find it more difficult to discount the probable effect the evidence would have on the penalty phase because of the potential significance of Chavers' and Carson's testimony as to several of the aggravators. Chavers' and Carson's testimony provided many of the inflammatory details of the crime. Specifically, Chavers testified that Lightbourne told him that he had surprised the victim as she was coming out of the shower, forced her to perform sex acts, including forcing her to perform oral sex "over and over," and that she "was begging him not to kill her." Carson testified that Lightbourne told him police "had him" for "shooting a bitch," meaning O'Farrell, and that he shot her because "she could identify him." This testimony provided graphic details of what allegedly occurred before the actual murder and may have formed the basis of at least three of the aggravators found by the trial court-HAC, CCP and committed to avoid arrest. Without their graphic testimony of what Lightbourne allegedly told them, there is serious doubt about at least two of these aggravators HAC and committed to avoid arrest. We simply cannot ignore this cumulative picture and the effect it may have had on the imposition of the death penalty. We remand for an evidentiary hearing as to Emanuel's testimony and for the trial court to consider the cumulative effect of the post-trial evidence in evaluating the reliability and veracity of Chavers' and Carson's trial testimony in determining whether a new penalty phase hearing is required, either under Lightbourne's Brady or newly discovered evidence claims.
It is so ordered.
HARDING, C.J., WELLS, ANSTEAD and PARIENTE, JJ., and OVERTON and KOGAN, Senior Justices, concur.
SHAW, J., concurs in result only.
NOTES
[1] The evidence at trial during the guilt phase included pubic hair matching Lightbourne's and semen consistent with his blood type, which were found on the victim's body. There was also testimony that Lightbourne, who had been an employee of O'Farrell's father prior to the crime, was seen with a unique .25 caliber pistol just a few days before the crime and was arrested a week after the murder with the weapon still in his possession. A bullet casing found in Lightbourne's automobile matched a bullet casing found at the scene of the crime and in the opinion of the expert witness, the bullet that killed Ms. O'Farrell was fired from Lightbourne's.25 caliber pistol. Lightbourne was also found in possession of a unique necklace later identified as belonging to O'Farrell. Lightbourne told police that both the necklace and gun were his.
[2] "According to Chavers, petitioner knew that the police would find no fingerprints, knew that the telephone wires had been cut, and knew that Nancy was found lying on her back." Lightbourne v. Dugger, 829 F.2d 1012, 1016 n. 2. (11th Cir.1987).
[3] "Although Chavers's testimony reveals that petitioner never explicitly admitted killing Nancy, Chavers stated that petitioner never denied it and made statements giving rise to the inference that he took her life." Id. at n. 3.
[4] Justices Overton, McDonald and Shaw dissented from the summary denial.
[5] In this proceeding, Carson has substantially recanted that testimony.
[6] The Eleventh Circuit also considered and rejected a conflict of interest claim based on the fact that the Public Defender's Office, which represented Lightbourne, had also represented Carson on his arrest for grand larceny and when he pleaded guilty. See Lightbourne, 829 F.2d at 1022.
[7] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[8] Justices Barkett, Shaw and Kogan dissented on this issue. See Lightbourne v. Dugger, 549 So.2d 1364, 1367-68 (Fla.1989). The majority decision did not dispute that the evidence revealed that the trial judge presiding over Lightbourne's trial had taken gifts from O'Farrell's father valued at over $2000 prior to the murder but concluded that Lightbourne was procedurally barred from bringing the claim at that time. We note, however, that the original trial judge in this case is not the trial judge who heard and presided over this most recent 3.850 evidentiary hearing.
[9] In rejecting Lightbourne's claim that the evidence was newly discovered and would have probably produced an acquittal, we noted that "much" of the evidence could not be characterized as newly discovered because it "has been known or should have been known for many years." Lightbourne v. State, 644 So.2d 54, 59 n. 6 (Fla.1994). We did not specify which evidence fell into this category, although presumably this would have applied only to some of the letters and taped telephone conversations. In the preceding opinion, Lightbourne v. Dugger, 549 So.2d 1364, 1365 (Fla.1989), in which we remanded for the evidentiary hearings which were at issue in the 1994 opinion, we found that the allegations of Lightbourne's motion regarding Chavers and Carson were not procedurally barred.
[10] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[11] The trial court in its order also noted that the State did not file any charges against Carson until 94 days after his arrest, which, in the judge's opinion, "indicates problems in the State's case, or a lack of desire to prosecute."
[12] The defense lawyer who represented Carson worked at the Public Defender's office at the time it also represented Lightbourne. See Lightbourne, 829 F.2d at 1022-23.
[13] MR. NOLAS [CCR counsel for Lightbourne]: Mr. Carnegia, Mr. Carson and Mr. Emanuel, who is another inmate that we're in the process of trying to subpoena as well. And Ms. Farley and Mr. Mack, if Your Honor would like to hear it, can tell you about their efforts to try and find him. He was another inmate at the time.

THE COURT: Emanuel?
MR. NOLAS: Yeah: Larry, Lawrence Emanuel, Your Honor.
THE COURT: They've not located him?
MR. NOLAS: No. If your Honor wants, Ms. Farley can represent to Your Honor her efforts to try to find Mr. Emanuel.
THE COURT: Not necessary at this point. You have or have not found him?
MR. NOLAS: We have not found him and he's not incarcerated.... We are still in the process of trying to find him.
[14] Martin McClain acted as Lightbourne's counsel in the appeal of this case as well. Bret Strand and Gail Anderson acted as Lightbourne's counsel during the trial court proceedings at issue in this appeal.
[15] Giglio v. United States, 405 U.S. 150, 92. S.Ct. 763, 31 L.Ed.2d 104 (1972), dealt specifically with the government's withholding evidence of an agreement for the witnesses' testimony and then presenting testimony that there was no such agreement.