# Supreme Court of Florida

_____

No. SC13-2246
_____

**DERRICK TYRONE SMITH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[October 5, 2017]

PER CURIAM.

Derrick Tyrone Smith, a prisoner under sentence of death, appeals two circuit court orders denying his successive motions for postconviction relief filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons we explain, we affirm the circuit court's orders denying relief.

## I. BACKGROUND

Smith was convicted of and sentenced to death for the March 21, 1983, first-degree murder of Jeffrey Songer, a cab driver in St. Petersburg, Florida. Smith was initially tried, convicted, and sentenced to death in 1983, but we reversed the

conviction and sentence on appeal and remanded for a new trial because of the admission of improper comments on Smith's right to remain silent and a statement Smith made to a detective after he invoked his right to remain silent. Smith v. State, 492 So. 2d 1063, 1065-67 (Fla. 1986). In 1990, Smith was again tried, convicted, and sentenced to death, and we affirmed the conviction and sentence on appeal after the retrial. Smith v. State, 641 So. 2d 1319 (Fla. 1994). We also affirmed the denial of Smith's initial motion for postconviction relief and denied his petition for a writ of habeas corpus. Smith v. State, 931 So. 2d 790 (Fla. 2006).

Smith then filed a federal habeas petition in the United States District Court for the Middle District of Florida, which was denied on August 8, 2007. Smith v. Sec'y, Dep't of Corr., No. 8:06-cv-01330-T-17MAP, 2007 WL 2302207 (M.D. Fla. Aug. 8, 2007), aff'd in part, vacated in part, remanded, 572 F.3d 1327 (11th Cir. 2009). On appeal, the United States Court of Appeals for the Eleventh Circuit affirmed in part and remanded in part for the Middle District to perform a cumulative materiality analysis of six Brady v. Maryland, 373 U.S. 83 (1963), claims[1] raised in Smith's initial postconviction motion, as required by Kyles v.

_____

1. The six Brady claims are:

(1) Melvin Jones sought help from the prosecutor with the probation violation and grand theft charges against him; (2) Melvin Jones, fearing arrest, sought help from the prosecutor in regard to the sexual abuse allegations his daughter was making against him; (3) one or more police reports indicated that Melvin Jones had initially been

Whitley, 514 U.S. 419 (1995).  Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1352 (11th Cir. 2009).  On October 19, 2009, the Middle District, after conducting a cumulative materiality analysis, concluded that Smith was not entitled to habeas relief.  Smith v. Sec'y, Dep't of Corr., No. 8:06-cv-1330-T-17MAP, 2009 WL 3416775 (M.D. Fla. Oct. 19, 2009), vacated and remanded, No. 10-11562, 2011 WL 4810173 (11th Cir. Oct. 12, 2011).

On July 2, 2007, while his federal habeas petition was pending, Smith filed a successive rule 3.851 motion for postconviction relief, which was summarily denied by the postconviction court.  On appeal in 2011, we reversed the summary denial of Smith's successive motion and remanded the case to the circuit court for an evidentiary hearing on "Smith's allegations that (1) letters from the Federal Bureau of Investigation regarding expert testimony on comparative bullet lead analysis [(CBLA)] offered at his retrial constituted newly discovered evidence and (2) the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose

---

considered as a suspect in 1983; (4) a prosecutor's synopsis of an interview of David McGruder and some police reports cast doubt on McGruder's identification of Smith; (5) a prosecutor's note indicated that Jones and Johnson had met briefly in a holding cell before the 1983 trial; and (6) several reports showed that Priscilla Walker's statement to the police about when Smith was at her house conflicted with statements by others about where he was during that time.

Smith v. State, 75 So. 3d 205, 206 (Fla. 2011) (quoting Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1348 (11th Cir. 2009)).

information regarding trial witness Priscilla Walker." Smith v. State, 75 So. 3d 205, 206 (Fla. 2011). We also remanded the six Brady claims identified by the Eleventh Circuit for consideration under the cumulative materiality analysis required by Kyles, in light of the Eleventh Circuit's 2009 decision, in which the Eleventh Circuit determined that the Brady claims, which were also raised in Smith's federal habeas petition, "involve[d] favorable evidence that was actually suppressed," Smith, 572 F.3d at 1348. See Smith, 75 So. 3d at 206. And in light of our 2011 remand, the Eleventh Circuit vacated the Middle District's 2009 order determining that Smith was not entitled to habeas relief after a cumulative materiality analysis of the six remanded Brady claims and again remanded with instructions for the district court to hold the federal habeas proceeding in abeyance pending the completion of the state collateral proceedings and this appeal from those proceedings. Smith v. Sec'y, Dep't of Corr., No. 10-11562, 2011 WL 4810173, at *1 (11th Cir. Oct. 12, 2011).

After this Court's remand in 2011, the postconviction court held an evidentiary hearing on Smith's newly discovered evidence and Brady claims and thereafter denied relief. During the pendency of the remand, on August 13, 2013, Smith filed another successive postconviction motion in the circuit court, which was summarily denied on November 18, 2013. Smith now appeals these orders denying relief.

## II. ANALYSIS

Smith argues that the postconviction court erred in failing to conduct its cumulative materiality analysis of the <u>Brady</u> claims in accordance with <u>Kyles</u>, that the postconviction court erred in failing to include the State's failure to disclose Priscilla Walker's 1988 obstruction conviction in its cumulative materiality analysis, and that the postconviction court erred in failing to conduct its newly discovered evidence analysis in accordance with <u>Jones v. State</u>, 709 So. 2d 512 (Fla. 1998), and <u>Swafford v. State</u>, 125 So. 3d 760 (Fla. 2013). For the reasons explained below, we affirm the circuit court's denial of postconviction relief.

## A. **<u>Brady</u> Claims**

Smith argues that the postconviction court erred in failing to employ the proper standard when conducting its cumulative materiality analysis of his <u>Brady</u> claims and to include the State's failure to disclose Priscilla Walker's misdemeanor conviction for obstruction in its cumulative materiality analysis. We disagree.

The Supreme Court has held that the "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." <u>Brady</u>, 373 U.S. at 87. "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently;

and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). To establish prejudice, the defendant must demonstrate that the suppressed evidence is material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). In other words, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.

In making the materiality determination, a court must first "evaluate the tendency and force of the undisclosed evidence item by item" before separately "evaluat[ing] its cumulative effect." See id. at 436 n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion . . . ."). "Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial." Smith, 572 F.3d at 1334. "A 'reasonable probability' of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." Id. (citing Kyles, 514 U.S. at 434, 436 & n.10, 437).

- 6 -

In addition to the six Brady claims that were remanded for consideration under the Kyles cumulative materiality analysis, the postconviction court found a seventh Brady violation. The postconviction court concluded that Priscilla Walker had a 1989 shoplifting conviction under the alias Priscilla Smith that was suppressed by the State and favorable to Smith because it was "somewhat impeaching." Although the court did not find that the failure to disclose the shoplifting conviction was by itself sufficiently material to undermine confidence in the guilty verdict, it did consider this nondisclosure cumulatively with the other six Brady claims that were remanded for consideration in a cumulative materiality analysis. The postconviction court also considered the seven Brady claims in conjunction with the newly discovered CBLA evidence. The postconviction court concluded that "[a]fter weighing the evidence presented at trial and adjusting for the new and withheld evidence" its "confidence in the guilty verdict ha[d] not been undermined."

As did the postconviction court, we adopt the Eleventh Circuit's item by item analysis of the six remanded Brady claims. See Smith, 572 F.3d at 1342-46. As to the seventh Brady claim, Walker's 1989 shoplifting conviction, we agree with the postconviction court's conclusion that the fact of the conviction standing alone is not material. We also agree that because the conviction was not disclosed and could have been used to impeach Walker under section 90.610(1), Florida

Statutes (1989),[2] the postconviction court properly considered it along with the other six Brady claims and the newly discovered CBLA evidence in the cumulative materiality analysis.

The postconviction court properly considered the collective force of the new and undisclosed evidence and weighed it against the totality of the evidence that was presented at the trial. We find no error in the postconviction court's analysis and agree that taking the collective impact of all the suppressed evidence and the newly discovered evidence and weighing it against the totality of the evidence that was introduced at the trial does not put the whole case in such a different light as to undermine confidence in the verdict.

Smith also asserts that the postconviction court erred in failing to include the State's failure to disclose Walker's 1988 misdemeanor obstruction conviction in its cumulative materiality analysis. On June 27, 1988, Walker and her half brother, Henry Cummings, were arrested in connection with a single incident. Walker was charged with obstruction. Cummings, who used the name Marcus White for the

_____

2. Section 90.610(1), Florida Statutes, provides that evidence that a witness has been convicted of a crime may be used to attack the credibility of a witness, if the crime was a felony or a crime involving dishonesty or a false statement. A theft, such as shoplifting, is a crime of dishonesty. See State v. Page, 449 So. 2d 813, 815 (Fla. 1984) ("It is our view that the commission of petit theft, or any other offense falling within the scope of chapter 812, Florida Statutes (1981), necessarily involves 'dishonesty' so as to bring any conviction for such a crime within the scope of subsection 90.610(1)." (Footnote omitted.)).

arrest, was charged with disorderly conduct. Cummings pleaded no contest the following day and was sentenced to time served and released. Walker pleaded no contest to the obstruction charge on August 1, 1988, and the sentence imposed at that time was to "pay [a] fine and costs in the amount of $100.00 to be taken out of [her] bond."

On August 5, 1988, Walker was interviewed by Scott Hopkins, an investigator with the State Attorney's Office. During that interview, Walker told Hopkins that Smith had confessed to her shortly after the murder on March 21, 1983, that he had just "shot a cracker in the back." Walker had not previously advised law enforcement of Smith's confession.

> Smith argues that
>
> had the defense known of the obstruction conviction, the timing of the arrest, and the involvement of Walker's brother as the co-defendant, Mr. Smith's trial counsel could have used the undisclosed information to suggest that in late July and early of [sic] 1988 when Walker told law enforcement of Mr. Smith's alleged statement to her in 1983 (which she had not previously revealed), she had reason to seek to curry favor with the State . . . .

Appellant's Initial Brief at 71, Smith v. State, No. 13-2246 (Fla. June 26, 2014). We disagree. Because Walker's obstruction charge had already been resolved at the time she revealed Smith's confession, it did not serve as a reason for her to curry favor with the State and would not have served to impeach her testimony at Smith's trial.

Smith further argues that when Walker first told the State that Smith confessed the murder to her, she could have been attempting to curry favor for her brother's disorderly conduct charge. Smith states:

> For exactly the same reason that the Eleventh Circuit ruled that the note discussing [Melvin] Jones's fear of a sexual abuse allegation was undisclosed impeachment, the existence of the obstruction case against her and the disorderly conduct case against her brother could have been used as impeachment regarding her statement in late July and/or early August incriminating Mr. Smith in the homicide.

Appellant's Initial Brief at 73, Smith v. State, No. 13-2246 (Fla. June 26, 2014). While we recognize that the Eleventh Circuit "has held that evidence of motivation to testify, especially for key prosecution witnesses, is impeachment evidence that must be disclosed," Smith, 572 F.3d at 1343, there is no evidence here to support Smith's claim that on August 5, 1988, when Walker advised law enforcement of Smith's confession, she was motivated by a desire to obtain a favorable resolution of her brother's disorderly conduct charge. Cummings testified at the evidentiary hearing that his disorderly conduct charge was resolved the day after his arrest in June 1988. Thus, there is no support for Smith's claim that Walker's obstruction charge or Cummings' disorderly conduct charge were evidence of Walker's motivation to testify.

Smith also asserts in a footnote in his "Statement of the Case" that at the time Walker advised the State of Smith's confession "the charges against her brother remained pending" and thereafter "her brother was able to plead out to

- 10 -

probation." Appellant's Initial Brief at 18 n.23, <u>Smith v. State</u>, No. 13-2246 (Fla. June 26, 2014). But Smith fails to point to anything in the record indicating that Cummings had charges pending against him on August 5, 1988, to which he thereafter "was able to plead out to probation." In fact, the record seems to refute this claim; Cummings testified that after he resolved the disorderly conduct charge in June 1998, he was arrested in another criminal case and sentenced to prison.

Further, because Walker's obstruction conviction was not a crime of dishonesty or false statement, it could not have been used to impeach her credibility at Smith's trial under section 90.610(1), Florida Statutes, or any other provision of the Florida Evidence Code. There is simply no record support for Smith's claim that disclosure of Walker's obstruction conviction would have allowed him to impeach Walker at trial or provided him with evidence that he could use to "suggest" that her testimony was motivated by a desire to curry favor for her own or her brother's pending criminal charges. Accordingly, the postconviction court did not err in omitting the State's failure to disclose the obstruction conviction from its cumulative materiality analysis.[3]

---

3. Smith also claims that disclosure of the obstruction conviction would have led the defense to the discovery that Walker had a brother from whom defense counsel could have learned that Walker told her brother that she did not believe that Smith committed the murder. However, this claim does not establish a <u>Brady</u> violation. The fact that Walker had a brother was not suppressed by the State.

## B. Newly Discovered Evidence Regarding CBLA

At Smith's trial, the State

> presented physical evidence and expert testimony linking Smith to the murder. FBI Agent Robert Sibert testified that Smith's jeans pocket contained lead residue consistent with bullets. The State put into evidence a bullet fragment taken from Songer's clothing. Two other FBI agents, Asbery and Havekost, were qualified as experts and testified that the bullet fragment, according to lead compositional analysis, "matched" bullets from the ammunition box Roy Cone[, Smith's uncle,] had purchased in 1972 and still possessed at the time of the murder. The State used this evidence to argue that it was Smith who had stolen his uncle's gun and some bullets that had come from the box—bullets that were used to kill the victim. The gun itself was never found.

Smith, 572 F.3d at 1331-32.

Smith's newly discovered evidence claim is predicated on letters sent by the FBI to the State in 2008 and 2009 regarding the CBLA testimony presented at Smith's trial. The letters indicated that in his testimony at Smith's trial, Agent Havekost overstated the significance of the results of the CBLA. At the evidentiary hearing held on this claim in 2013, Smith presented testimony from three expert witnesses regarding his CBLA newly discovered evidence claim. After the evidentiary hearing, the postconviction court denied relief on this claim.

In Jones, 709 So. 2d at 521, this Court set forth the test for a conviction to be set aside on the basis of newly discovered evidence as follows:

> First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at

the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."

Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. To reach this conclusion the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at the trial."

(Alteration in original) (citations omitted). In Swafford, 125 So. 3d at 775-76, we explained the Jones analysis further as follows:

The Jones standard requires that, in considering the effect of the newly discovered evidence, we consider all of the admissible evidence that could be introduced at a new trial. In determining the impact of the newly discovered evidence, the Court must conduct a cumulative analysis of all the evidence so that there is a "total picture" of the case and "all the circumstances of the case." As this Court held in Lightbourne[ v. State, 742 So. 2d 238, 247 (Fla. 1999)], a trial court must even consider testimony that was previously excluded as procedurally barred or presented in another proceeding in determining if there is a probability of an acquittal. . . . [T]his requirement not only is consistent with our precedent, but is also consistent with logic, as the Jones standard focuses on the likely result that would occur during a new trial with all admissible evidence at the new trial being relevant to that analysis.

(Citations omitted.)

Here, the postconviction court concluded that the letters from the FBI qualified as newly discovered under the first prong of the Jones test, but they did not met the second prong of the Jones test. The court explained:

At trial, the State relied on the CBLA evidence to supplement a case otherwise based on eyewitness testimony of several witnesses, whose credibility the jury had the opportunity to evaluate, as well as other circumstantial evidence. Certainly, in light of the post-trial

- 13 -

developments regarding CBLA, Agent Havekost's trial testimony might well have been impeached with the new evidence regarding the reliability of CBLA, if its admission was even allowed.

While the erosion of CBLA was unknown at the time of trial and the fact that potentially inaccurate testimony became a feature of the Defendant's 1990 trial, the Court cannot say that the absence of the CBLA evidence or compelling impeachment of the CBLA evidence would produce an acquittal on retrial.

We agree that even the complete absence of CBLA evidence at a retrial would not probably produce an acquittal. There is ample non-CBLA evidence in this case. At Smith's 1990 retrial, Smith's uncle, Roy Cone, testified that he owned a .38 Smith & Wesson blue steel handgun with a brown handle from 1972 to 1983. The gun went missing sometime between January and March of 1983. Smith had previously lived at Cone's house and had last visited in February or March of 1983, around the time the gun went missing.

Carolyn Mathis, James Matthews, Priscilla Walker, Derrick Johnson, and Ernest Rouse, all testified that Smith was in possession of a gun on March 20, 1983. Rouse described the gun as a "blue/black revolver with a brown handle." Johnson described the gun as a .38-caliber revolver with a six-inch barrel, a brown handle, and a black cylinder. Carolyn Mathis described the gun as "shiny" and said that Smith was trying to sell it for $50. Both Melvin Jones and Johnson, Smith's codefendant, testified that they saw Smith shoot the victim. Jones testified that he saw Smith flee the scene with the gun, which he identified as a .32- or .38-caliber revolver.

- 14 -

The night of the murder, Smith told Regina Mathis that he was going to "hustle" some money. He also told James Matthews that he intended to get some money that night. Rouse said that Smith and Johnson were together on the night of the murder, and both Mathis sisters saw a man matching Johnson's description with Smith that night. No one saw Johnson with a gun.

Johnson testified that he and Smith formulated several different plans for committing an armed robbery the night of the murder before eventually settling on a plan to call a cab and rob the driver. Johnson testified that Smith used the phone at the Hogley Wogley BBQ to call a cab shortly after midnight on March 21, 1983. Fingerprint evidence confirmed that Smith used the phone at the Hogley Wogley. Johnson said that the plan was for him to ride in the front seat of the cab and for Smith to ride in the back and to hold the gun on the driver while Johnson took his money.

David McGruder, the cook at the Hogley Wogley, testified that he saw two men matching the descriptions of Smith and Johnson at the Hogley Wogley that night. McGruder also testified that he saw the man matching Smith's description use the phone and enter the back seat of the cab when it arrived, although he was not certain that the man was Smith.

Walker testified that after the murder, between midnight and 1 a.m., Smith returned to her house and told her that he had just "shot a cracker in the back"

because "he act[ed] like he didn't want to give up the money." Matthews said that he arrived back at Walker's house between midnight and 2 a.m. and Smith told him that he "might have shot someone."

Marcel DeBulle, a Canadian tourist, testified that Smith robbed him in his motel room around noon on March 21, 1983, about twelve hours after the murder. DeBulle said that Smith held a revolver with a shiny, blue, steel barrel to his head. Fingerprints on DeBulle's briefcase, which Smith handled during the robbery, were matched to Smith.[4]

Because there is ample non-CBLA evidence that would be admissible at a retrial to establish Smith's role in Songer's murder and his identity as the shooter, we cannot say that the exclusion of the CBLA evidence at a retrial would probably produce an acquittal. This is true even when the exclusion of the CBLA evidence is considered cumulatively with the seven Brady violations discussed herein and Smith's various Brady, Giglio, and newly discovered evidence claims that were previously raised and found barred or otherwise denied.

### III. CONCLUSION

For the reasons stated above, we affirm the postconviction court's orders denying Smith's successive motions for postconviction relief.

---

4. Smith was convicted of the armed robbery in a separate proceeding and is serving a life sentence for it.

It is so ordered.

LABARGA, C.J., and LEWIS, CANADY, POLSTON, and LAWSON, JJ., concur.
PARIENTE, J., dissents with an opinion.
QUINCE, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

PARIENTE, J., dissenting.

I respectfully but strongly disagree with the majority. When a proper

cumulative error analysis is performed, there can be no doubt that confidence in

the outcome is undermined when the newly discovered evidence claim is combined

with the multiple Brady claims.[5] While no single claim may rise to the level of

requiring a new trial, the collective import of the errors—discrediting of a key

piece of forensic evidence together with the State's multiple significant failures to

produce evidence favorable to the defendant—compels that Smith be granted a

new trial.

---

5. Brady v. Maryland, 373 U.S. 83 (1963). In my view, any other outcome
would be a violation of Smith's constitutional right to due process. See id. at 87.
"Society wins not only when the guilty are convicted but when criminal trials are
fair; our system of the administration of justice suffers when any accused is treated
unfairly. . . . A prosecution that withholds evidence on demand of an accused . . .
casts the prosecutor in the role of an architect of a proceeding that does not
comport with standards of justice." Id. at 87-88.

## Newly Discovered Evidence Claim

As to Smith's newly discovered evidence claim, the State's comparative lead bullet analysis (CBLA) expert witnesses have now been fully discredited, as has the underlying science. Yet, at trial, the State argued that the CBLA proved that the bullet that killed the victim was "materially indistinguishable . . . [or] the same" as bullets from a box found at Smith's uncle's house, which Smith had access to, and the chances of finding a box of bullets with the same composition as a box made ten years before "just boggles the mind." It does "boggle the mind" that the jury was told that there was solid science linking a particular bullet to Smith when the FBI has since reported that such science can do nothing of the sort.

We now know that the FBI has reported CBLA forensic evidence could not be used to determine, for a fact, that any bullet or bullets came from the same box or set produced by the manufacturer. The CBLA evidence was used by the State to prove that ammunition hidden with the gun in Smith's uncle's home was the same ammunition used to murder the victim. Indeed, the postconviction court stated, "The evidence linking the bullet fragment taken from the victim Jeffrey Songer to the ten-year-old gun and box of bullets owned by the Defendant's Uncle Roy Cone became a feature of the Defendant's trial. The State emphasized the testimony of the FBI agents as being corroborative of all the other trial testimony and evidence."

Thus, this evidence, a key forensic pillar upon which the State based the rest of its case, is no longer reliable and weighs heavily in favor of the defendant when considered cumulatively with the Brady claims that follow.

**Brady Claims**

As to Smith's seven Brady claims and the Eleventh Circuit Court of Appeals' concerns with this Court's original failure to perform a cumulative error analysis, I first note that this case does not involve just one Brady claim but, rather, a pattern of multiple failures on the part of the State to disclose evidence that would have been favorable to Smith. While not one piece of undisclosed evidence, itself, meets the standard for reversal under Brady, a cumulative error analysis of the claims, coupled with the newly discovered evidence above, compels vacating Smith's conviction and sentence and remanding this case for a new trial.

Cumulative error analysis of all undisclosed evidence is necessary "because the sum of the parts almost invariably will be greater than any individual part." Smith v. Sec'y, Dep't of Corrs., 572 F.3d 1327, 1348 (11th Cir. 2009). Indeed, the postconviction court's order denying Smith relief is replete with statements such as: "This court is troubled by the Brady violations noted by the Eleventh Circuit Court of Appeals"; Melvin Jones "was an important State witness since he was the only eyewitness who was not involved in the robbery and murder, and both the State and the defense recognized that his credibility was important"; "The evidence

- 19 -

that the CBLA testimony has been eroded since the trial and was, in all likelihood, given undue weight is of concern to the court"; and "The [CBLA] evidence linking the bullet fragment taken from the victim to Jeffrey Songer to the ten-year-old gun and box of bullets owned by the Defendant's Uncle Roy Cone became a feature of the Defendant's trial."

## A. Melvin Jones

As to Smith's <u>Brady</u> claims, I start with the crucial witness, Melvin Jones, who placed Smith at the scene of the crime. As the postconviction court noted, Jones was the only witness to the crime who was not part of the robbery and murder.

The State failed to disclose that at the time of trial "Melvin Jones was not content with the assistance he received from the State for his testimony at the 1983 trial, and told the State that he wanted help with some pending probation violations and a grand theft charge." Second, Jones, fearing arrest, sought additional help from the prosecutor in exchange for his testimony in Smith's second trial, to deal with his daughter's allegation that he sexually abused her. Third, one or more police reports indicated that Jones was initially considered as a suspect in this case in 1983. Fourth, a prosecutor's note indicated that Jones and Johnson had met briefly in a holding cell before the 1983 trial.

- 20 -

This evidence regarding Jones' new motivation for testifying in the retrial—that he was testifying in an attempt to avoid arrest and prosecution for sexual abuse allegations—is particularly concerning. Even though the jury was able to consider Jones' twenty-four prior convictions and that he was hiding from the police on the night of the murder, his new motivation for testifying could have been used to further attack his credibility with the jury. As the Eleventh Circuit stated:

> Melvin Jones was an important State witness. He was the only eyewitness to the crime who was not involved in the robbery and murder. Both sides recognized that his credibility was important, and the defense cross-examined him intensely about his motivation to testify at the 1983 trial and about the sentencing break he got for that testimony. At the 1990 trial, however, the defense had nothing to show that Jones had a motive for testifying against Smith again since the charges he had faced in 1983 were long gone. The State failed to disclose that Jones did have a new reason to curry favor with the prosecution-that he feared he would be charged with a serious crime, that he was looking for help from the prosecutor if his fears were realized, and that he had talked with the prosecutor about it before he testified at the 1990 trial.

Smith, 572 F.3d at 1343.

Perhaps most disconcerting, the State failed to disclose that Jones and codefendant Johnson met in jail before Smith's 1983 trial. The postconviction court found that the State failed to disclose that on July 11, 1984, "Jones approached Johnson in a holding cell, showed him a map of the crime scene, and offered to help him in connection with the case." Id. at 1345. The State conceded this information met the first two prongs of Brady but argued that the evidence was

immaterial. However, as part of its cumulative analysis, the postconviction court

found:

> Both Melvin Jones' and co-defendant's testimony is weakened by evidence that they met in jail before the Defendant's 1983 trial. . . . Allegedly, Derrick Johnson reported that Melvin Jones approached him and that he was so unnerved that he immediately called the guards and asked to be removed from the holding cell.

Despite knowing there was evidence of collusion before the trial between Jones

and the codefendant, during closing arguments:

> [T]he State emphasized that any suggestion that Derrick Johnson and Melvin Jones colluded was without merit. "Now, was there any testimony from that witness stand that could lead you to believe that Derrick Johnson and Melvin Jones got together and fabricated this testimony in order to pin the [blame on] Derrick Smith? There is no testimony from that stand that they even new[sic] each other on March 23, 1983, other than Melvin Jones saying, I knew him on the street as being New York. Did you socialize with him. No, I just knew of him as New York."

### B. David McGruder

Further, the State suppressed evidence of another key report that could have

been used to impeach State witness David McGruder. McGruder's testimony was

the only testimony that placed Smith at the convenience store during the early

morning hour immediately preceding the murder. Police reports and a synopsis of

a police interview indicate that Smith was as much as seventy-five pounds heavier

than the man McGruder described to police as using the pay phone at the

convenience store before getting in the cab with the victim. Clearly this

- 22 -

information would have provided powerful impeachment to this eyewitness's testimony had the State produced the evidence to the defense, as is required.

### C.  Priscilla Walker

Finally, there is witness Priscilla Walker, who testified that shortly after the murder Smith returned to her home, told her that he had "shot a cracker in the back," and remained in her home until 5:00 a.m.  The undisclosed evidence, including several law enforcement reports, showed that Walker's statement to the police about when Smith was at her house conflicted with statements by others about where Smith was during that time, and that Walker had a 1989 shoplifting conviction under the alias Priscilla Smith, which could have also been used to attack her credibility at trial.  There was additional evidence suppressed that the police took Walker's boyfriend, who was living with her at the time, into custody on the night of the murder, thinking he was actually Smith.  This evidence could have also been used by the defendant to create reasonable doubt.

### CONCLUSION

I would conclude that when analyzed cumulatively, the Brady violations and newly discovered evidence, which cast doubt as to the veracity of the testimony of one of the State's key-witnesses, forensic evidence that became the feature of Smith's trial and a pillar upon which the State relied, and an additional witness who testified regarding a confession, is sufficient to undermine confidence in the

outcome of the verdict of Smith's trial. A key issue in Smith's trial was not only whether Smith was present at the crime scene, but whether Smith or the codefendant, Johnson, who was also in the cab, shot the driver. Without the evidence related to Brady claims and the newly discovered evidence relating to the veracity of the CBLA, the State could only prove that Smith had a revolver on the night of the crime; Smith was at the convenience store at some point and left his fingerprint on the public phone; and Smith was planning to "hustle" some money that night. The only eyewitness account of what happened the night of the murder, not attacked by a Brady claim, came from the codefendant in the case, Johnson, who received a plea bargain in exchange for this testimony—hardly a reliable witness. Smith, 572 F.3d at 1330-32.

Nine years ago, the Eleventh Circuit Court of Appeals criticized this Court for failing to perform a cumulative error analysis:

> There is room for debate about whether the Florida Supreme Court performed any cumulative analysis of the favorable evidence it found had been withheld from the defense. See Smith, 931 So. 2d at 797-99. However, there is no room for debate about whether that court performed a cumulative materiality analysis of all six of the pieces of favorable evidence we have concluded were withheld from the defense. As we have pointed out, the Florida Supreme Court unreasonably determined that the fact Melvin Jones had talked with the prosecutor before the 1990 trial about his fears that he would be charged with the sexual abuse of his daughter was not impeachment evidence under Brady. For that reason the court did not consider that evidence in conducting its materiality analysis, whether that analysis was cumulative or not. It follows that we cannot defer to its decision about whether the withheld evidence was material.

Id. at 1348 (emphasis added) (citation omitted). And, although this Court remanded for an evidentiary hearing and cumulative error analysis in Smith v. State, 75 So. 3d 205, 206 (Fla. 2011), and the trial court issued a comprehensive twenty-three page order detailing its analysis, this Court now fails to explain why the cumulative errors in this case do not undermine the Court's confidence in the outcome other than agreeing with the trial court in a cursory manner. See majority op. at 8. However, when reviewing Brady claims, it is this Court's obligation not to simply defer to the trial court, but to perform a de novo review. See Geralds v. State, 111 So. 3d 778, 787 (Fla. 2010) (citing Mordenti v. State, 894 So. 2d 161, 169 (Fla. 2004); Way v. State, 760 So. 2d 903, 913 (Fla. 2000) (deferring to the court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of suppressed evidence)). This Court has once again failed to perform a proper cumulative error analysis.

On the balance of equities, confidence in the outcome is certainly undermined both as to the guilt and certainly as to the penalty phase of Smith's trial. Accordingly, justice compels this Court to vacate Smith's conviction and sentence and remand his case for a new trial free from the taint of the flawed forensic evidence, and with a defense armed with the evidence underlying the multiple Brady claims that will considerably weaken each aspect of the State's

case. When the numerous <u>Brady</u> claims are considered cumulatively with the newly discovered evidence claim, justice requires that Smith be given a new trial.

Accordingly, I dissent.

An Appeal from the Circuit Court in and for Pinellas County,
     Mark Irwin Shames, Judge - Case No. 521983CF002653XXXXNO

Martin J. McClain of McClain & McDermott, P.A., Wilton Manors, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida and Scott A. Browne, Senior Assistant Attorney General, Tampa, Florida,

     for Appellee